Paulette Andrews SMITH

v.

Todd Martin SMITH.

No. 2008–67–Appeal.

Supreme Court of Rhode Island.

March 9, 2009.

**110**

Paulette Andrews Smith, pro se.

Kelly M. Fracassa, Esq., Westerly, Nathaniel J. Nazareth, Jr., Esq., Wakefield, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Before this Court is an appeal by the plaintiff, Paulette Andrews Smith, from a Family Court judgment dismissing her complaint. The plaintiff filed a complaint for divorce against the defendant, Todd Martin Smith, in which she alleged that a common-law marriage had existed between them for more than ten years. At trial, after hearing testimony from several witnesses, the trial justice dismissed the plaintiff's complaint after she found that the plaintiff had failed to prove the existence of a common-law marriage by clear and convincing evidence. The plaintiff timely appealed.

This case came before the Supreme Court for oral argument on December 9, 2008, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the parties' arguments and considering the memoranda submitted by counsel, we are satisfied that cause has not been shown. Accordingly, we will decide the appeal at this time. For the reasons set forth in this opinion, we affirm the judgment of the Family Court.

**Facts and Procedural History**

This sad and unfortunate story of a broken relationship begins in September 1989, when Paulette and Todd met and fell in love. In 1990, Todd moved in with Paulette and her two children, who at that

time were two and ten years of age.[1] Their relationship continued, but no marriage ceremony ever took place. The parties lived together for almost sixteen years; however, Todd's infidelity and alcoholism, Paulette's health problems, and Paulette's son's difficulty with addiction issues increasingly strained their relationship. In 1997, Todd's drinking problems apparently intensified, and the couple went though a period of separation. In 1998, Paulette confronted Todd about a relationship he was having with another woman. Nevertheless, the couple reconciled soon thereafter, and Todd moved back into Paulette's home. Later that year, at Christmas, Todd gave Paulette a ring. In 2004, the parties moved into a house that Todd had built on land that his parents had given to him. During this time, Paulette, unfortunately, had been suffering from a series of health problems, and Todd became unhappy with the increasing burdens of their relationship. After a confrontation between Todd and Paulette's son, Todd changed the locks to the house. In May 2006, Paulette filed a complaint for divorce in the Washington County Family Court.[2]

The Family Court held nine days of hearings on Paulette's complaint for divorce between November 2006 and February 2007. At the trial, the parties stipulated to the following facts. They met in September 1989 and began cohabitating in January 1990. In 1991, they agreed to contribute to household expenses by equally dividing the bills. Paulette also began managing Todd's finances. They did not maintain any joint accounts, so Paulette paid Todd's bills and child support payments by signing his name on his checks. She also prepared his income tax returns.

However, each continued to file income tax returns separately as single persons. Todd listed Paulette as a driver on his automobile insurance policy, but the policy was in his name alone. During 1998 and 1999 Todd cosigned two loans for Paulette, which she later satisfied. In June 2002, Paulette filed a petition for bankruptcy, and she declared on that petition that she was single. At one point, Todd applied for a mortgage; he indicated on the application that he was single, and he did not designate Paulette as co-owner on any real estate deeds.

Paulette testified that Todd proposed marriage in 1989, and she accepted. She testified that she considered their common-law·marriage to have begun in 1991, and in 1998, he gave her a ring. She explained that at some point she desired a formal ceremony, even though she did not believe they needed one to be married to each other. She recalled that Todd told people that a formal ceremony was just a "piece of paper." She said that she wanted Todd to be with her because he wished to be with her, "not because of a piece of paper" and she did not wish to place "that kind of pressure on him." She testified that she often introduced Todd as her husband to a variety of people, including her son's substance-abuse counselor, her business associates, and their house painter. In 2001, during her battle with breast cancer, she represented herself to her doctor as Todd's wife, and Todd never corrected her when he was present. She also testified that various family members sent her greeting cards referring to her as "daughter-in-law" and to her children as "grandson" and "granddaughter." She recounted that on the occasion of her daugh-

---

1.  Todd also had two children from a prior marriage, but they lived with his ex-wife.

2.  Paulette filed the complaint under the name Paulette Andrews Smith, but on the signature line, she signed her name before a notary public as Paulette Andrews.

ter's wedding in Florida, Todd was introduced as her husband and that he took on the role of father of the bride. Additionally, Paulette testified that she talked about her "husband" and his support of her business efforts when she conversed with her business associates. She said that one of her friends/business associates who came to her house referred to Todd as her husband, yet Todd did not correct her. She also testified that in 2002 she began to use Todd's last name in her business relationships and contracts, but she did not change her name with the Internal Revenue Service, utility companies, or the Registry of Motor Vehicles. Paulette also testified that in 1997 or 1998 she asked her accountant if she should file her income tax returns designating herself as a married person, but he advised her not to do so. Paulette's accountant, however, testified that he did not remember Paulette telling him that she was married, and his only recollection of a discussion of common-law marriage was in 2006.

Todd's former wife also testified. She asserted that Todd's children referred to Paulette as their stepmother and that Paulette attended many of her children's parties and other celebrations where she was introduced as a stepmother or Todd's wife. She also said that Todd would refer to Paulette as "my old lady," an expression she described as one used by men to refer to their wives. She said that Todd was a better husband to Paulette than he had been to her, but she conceded that Todd never told her that he and Paulette were married.

Paulette's daughter testified that Todd was the only father figure that she had ever known, although she acknowledged that he had never formally adopted her.

She testified that Todd represented himself as her father. She recalled that her fiancé asked Todd for her hand in marriage and that Todd paid for some of the wedding expenses. She recalled that at her wedding in Florida, Todd was introduced as her father and as Paulette's husband. A counselor who had treated Paulette's son because of his substance-abuse problems also testified. She testified that in the initial consultation, she was told that Paulette and Todd were married for fifteen and a half years.[3]

When he took the witness stand, Todd testified that he and Paulette lived together in a familial relationship for about fifteen years and that he had loved Paulette for a long time, but he also maintained that they had never married. He admitted that when they first started seeing each other, he asked Paulette to marry him and that she accepted his proposal. He conceded that he gave her a ring, but he also declared that he did not consider them to be engaged to each other. He avowed that people who knew them were aware that they were not married. A 2001 fuel delivery bill from a friend of Todd, who owned an oil company, was entered into evidence; that document referred to Paulette as "Smitty's girlfriend." Todd testified that he never corrected Paulette when she introduced him as her husband because he did not want to "open up a can of worms." He admitted that he may have introduced Paulette as his wife at her daughter's wedding, but that they did not know most of the people present. He further said that other than at the wedding, he never introduced Paulette as his wife. He also recounted how their relationship deteriorated as a result of Paulette's health problems, as well as prob-

---

**3.** The counselor did not recall who gave her that information, but said that "it was more an understanding of were you living together, who was going to be providing the rules and regulation when the child went home."

lems with her son, and he admitted telling Paulette that he was tired of dealing with her financial woes and hospital treatments.

Todd's sister and mother also testified. The sister said that she had considered Paulette to be Todd's girlfriend, and that neither Todd nor Paulette ever told her that they were married. She characterized their relationship as "on again/off again." She admitted that she may have referred to Paulette as "sister-in-law" but that she had used the term as one of endearment. She testified that in 1999 she made a family tree and displayed it at a family party. The tree did not delineate Paulette or her children. She recalled that the family would ask Paulette and Todd why they would not marry, and they would respond that they did not want to "ruin a good thing." Todd's sister explained that she designed the wedding invitation for Paulette's daughter's wedding, but the invitation referred to the "parents" of the bride; it did not include their names nor did it designate them as husband and wife.[4] Todd's mother testified that she may have sent Paulette greeting cards over the years addressed to "daughter-in-law" and that she may have introduced her as her daughter-in-law several times. Moreover, she said that she was aware that her son was involved in Paulette's children's lives and that Paulette took care of Todd's finances.

The final witness to testify was the attorney who assisted Paulette in the filing of her bankruptcy petition. He testified that when Todd called him about representing Paulette, he said, "[a] friend of mine has problems, has economic problems," and he did not indicate that Paulette was his wife. He also testified that Paulette told him that she was single. He said that if Paulette had been married to Todd at the time of the bankruptcy, as the attorney, he would have been required to include Todd's name and income on the bankruptcy petition.

After hearing the testimony, on March 29, 2007, the trial justice issued a lengthy written decision that dismissed the complaint. She held that the evidence failed to establish, by clear and convincing evidence, the existence of a common-law marriage. She found that the parties never shared the requisite intent to be married and that although Paulette presented herself as Todd's "wife," their close friends and family did not consider them to be married.

In her appeal, Paulette avers that the trial justice overlooked and misconceived relevant and material evidence and that she was clearly wrong and failed to achieve substantial justice when she concluded that a common-law marriage did not exist between the parties. Paulette argues that the evidence proves that the parties held themselves out as husband and wife during their fifteen-year cohabitation, that they did everything as a married couple, and that defendant acted as if he was her husband in a family unit. She also asserts that the trial justice erred in concluding that defendant did not give her an engagement ring, when in fact Todd did give her a ring. After careful review of the record in this case, we conclude that the trial justice did not misconceive or overlook relevant evidence, and that her decision that the parties did not enter into a common-law marriage was not clearly wrong.

## Analysis

### Common–Law Marriage in Rhode Island

▮ The sole issue before this Court on appeal is whether the trial justice prop-

---

4. The wedding announcement in the Providence Sunday Journal referred to her as the daughter of Todd Martin Smith and Paulette Andrews–Smith, but it did not designate them as Mr. and Mrs.

erly dismissed plaintiff's complaint for divorce when she concluded that a common-law marriage had not been established. "In divorce actions, the findings of fact by a trial justice sitting without a jury are entitled to great weight and will not be disturbed by this Court on appeal unless the trial justice misconceived or overlooked relevant evidence or was clearly wrong." *DeMelo v. Zompa*, 844 A.2d 174, 177 (R.I.2004). This state recognizes common-law marriage. *Souza v. O'Hara*, 121 R.I. 88, 91, 395 A.2d 1060, 1062 (1978). "Although marriage is of the nature of a civil contract, it is a contract which is subject to the regulation of the state, in which in its inception or its dissolution the state has a vital interest." *Silva v. Merritt Chapman & Scott Corp.*, 52 R.I. 30, 32, 156 A. 512, 513 (1931). Therefore, to establish a common-law marriage, we have adopted the clear and convincing standard of proof. *See id.* A common-law marriage requires "evidence that the parties seriously intended to enter into the husband-wife relationship." *Sardonis v. Sardonis*, 106 R.I. 469, 472, 261 A.2d 22, 24 (1970) (citing *Ibello v. Sweet*, 47 R.I. 480, 482, 133 A. 801, 801–02 (1926)). In addition, the conduct of the parties must be "of such a character as to lead to a belief in the community that they were married." *Id.* (citing *Williams v. Herrick*, 21 R.I. 401, 402, 43 A. 1036, 1037 (1899)). The elements of intent and belief are demonstrated by "inference from cohabitation, declarations, reputation among kindred and friends, and other competent circumstantial evidence." *Id.*

### Serious Intent to Enter into a Husband–Wife Relationship

■ To establish a common-law marriage, Paulette was required to provide clear and convincing evidence of the parties' intent to enter the husband-wife relationship. *See Sardonis*, 106 R.I. at 472, 261 A.2d at 24. Although intent may be inferred from cohabitation, declarations, reputation, and other competent evidence, *id.*, cohabitation alone is not conclusive of intent to be husband and wife, and such evidence may be rebutted by counter-proof, *see Peck v. Peck*, 12 R.I. 485, 488 (1880). Furthermore, it is required that the parties must *mutually* and *presently* intend to be husband and wife rather than merely become engaged to be husband and wife at some point in the future. *See Ibello*, 47 R.I. at 482, 133 A. at 802 (intent evidenced when parties "consented to be husband and wife, *presently,* and at once entered into a changed relationship") (emphasis added); *Odd Fellows' Beneficial Association of Rhode Island v. Carpenter*, 17 R.I. 720, 722, 24 A. 578, 578 (1892) ("In order to constitute a [common-law marriage], the parties must agree to become husband and wife *presently*. The consent which is the foundation and essence of the contract must be mutual and given at the same time, and it must not be attended by an agreement that some intervening thing shall be done before the marriage takes effect* * *."); *Peck*, 12 R.I. at 488 ("the parties [must] consent to be husband and wife *presently,* and though cohabitation following an engagement is evidence of such consent, it is not conclusive, but only *prima facie* evidence of it, and as such open to rebuttal by counter proof").

■ To support her claim, Paulette testified that Todd proposed marriage in 1989, that she accepted Todd's proposal, that she considered their common-law marriage to have begun in 1991, and that at some later point, in 1998, Todd gave her a ring. She presented evidence that they cohabitated for a period in excess of ten years, and that she began to use his last name in 2002. She also submitted that Todd called her "my old lady," that he never corrected her when she referred to

him as her husband, and that he gave away her daughter as father of the bride.

At best, however, the evidence in this case is conflicting. The record reveals that the parties never had a ceremony or celebration of any kind, and the ring that she referred to was given to her at Christmas. Indeed, defendant testified that he did not consider himself to be engaged, but rather simply living with Paulette in a long-term relationship. Also, Todd testified that he did not correct Paulette when she called him husband because he did not want to cause a conflict. The evidence also established that Paulette declared herself, under penalty of perjury, to be a single person on her income tax returns and on her bankruptcy petition, and that Todd listed himself as single on his tax returns and on a mortgage application.

A review of this discordant evidence leads us to the inescapable conclusion that the trial justice was correct to hold that the plaintiff did not provide clear and convincing evidence of the parties' intent to be husband and wife. The ring was not a clear indication of Todd's intent because it was given on Christmas and may have been intended as a Christmas gift. Todd also gave her the ring about nine years after his proposal and about seven years after Paulette contended that they already were living as husband and wife. If indeed this was an engagement ring as plaintiff asserts, the timing of these circumstances negates any inference that Todd believed he had been married from 1991 to 1998.

Likewise, the declarations of the parties do not clearly support any serious intent to be husband and wife. Both Paulette and Todd consistently declared themselves as single on legal documents and forms, including their tax returns, as well as Paulette's bankruptcy petition. The trial justice correctly concluded that these declarations strongly weighed against any serious intent to be husband and wife.[5] *See De-Melo*, 844 A.2d at 178 (holding lack of intent to be married evidenced by tax returns, mortgage applications, and insurance applications listing party as single; lack of designation of other party as beneficiary on pension and 401K; and lack of holding joint property); *Lovegrove v. McCutcheon*, 712 A.2d 874, 874 (R.I.1998) (mem.) (holding parties cohabitating for fifteen years were not in common-law marriage because evidence revealed that the plaintiff designated herself as single on employment applications, the home was purchased under the defendant's name alone, and they did not pool their assets). Furthermore, the record reflects that although Todd referred to Paulette as "my old lady," (an equivocal term at best), he did not refer to her as his wife, except possibly on two occasions: once to the house painter and the other time to new acquaintances at the wedding of Paulette's daughter in Florida. The record also reveals that Todd did not even tell his family that he was married to Paulette, his friends did not believe that they were married, and when Paulette referred to him as her husband, he did not correct her in an effort to avoid confrontation. Moreover, although Paulette began to use Todd's name, that practice did not begin

---

5. The trial justice clearly gave significant weight to the testimony of the accountant and the bankruptcy attorney and she found them to be credible. We do not disturb findings of fact, credibility determinations, or the relative weight attached to testimony unless the trial justice was clearly wrong or "misconceived relevant evidence in respect to a material issue." *Cheetham v. Cheetham*, 493 A.2d 814, 816 (R.I.1985). Although Paulette testified that her accountant advised her to file her tax returns as a single person, the accountant did not remember Paulette ever telling him that she was married, and he did not recall any conversation with Paulette about common-law marriage until 2006.

until 2002, and even then she only used it on certain business papers and in her business dealings. She did not change her name with the Registry of Motor Vehicles, and there was no evidence that she changed her name with any other government entities, utilities, or private accounts. These ambiguities and inconsistencies do not support an argument that the couple had any serious mutual intent to be in a husband-wife relationship.

Furthermore, there was testimony that Todd believed that having a formal ceremony was just a matter of paperwork, and that Paulette wanted Todd to be with her because he wanted to be with her, and not because paperwork required it. Although a formal ceremony is not required to enter into a common-law marriage, the facts before the Family Court do not clearly support a mutual present intent to be husband and wife. Rather, these facts just as easily demonstrate that the parties simply desired to maintain the status quo and that they did not desire to change the nature of their relationship to involve "paperwork" or additional obligations. Therefore, it is our opinion that the trial justice was correct when she concluded that at most, the parties may have shared some vague intent to marry in the future, but that there was no clear and convincing evidence of a mutual present intent to enter into a husband-wife relationship.

### Belief in the Community

To establish a common-law marriage, Paulette also was required to provide clear and convincing evidence of a belief in the community that she and Todd were married. *See Sardonis,* 106 R.I. at 472, 261 A.2d at 24. Such a belief may be inferred from cohabitation, declarations, and reputation among friends and family. *Id.* The reputation, however, must be general and uniform. *Williams,* 21 R.I. at 403, 43 A. at 1037.

The parties presented conflicting evidence about whether there was a reputation in the community that they were married to each other. To support her claim, Paulette testified that she often introduced Todd as her husband to various people, including her doctor, her son's substance-abuse counselor, her business associates, and her home decorator. Also, certain family members referred to her on occasion as "daughter-in-law" or "sister-in-law." She noted that Todd took on the role of father of the bride for her daughter's wedding and that Todd's children called her "stepmother." Additionally, she testified that her friend/business associate referred to Todd as her husband, she talked about her "husband" to her business associates, and she used Todd's last name in her business dealings and contracts. Todd's mother and sister also conceded that they may have introduced Paulette as an in-law on occasion.

On the other hand, Todd testified that the people who knew the parties were aware that they were not married. The record is simply devoid of any testimony that any member of Todd's family believed that the couple was married. Indeed, Todd's sister testified that in 1999 she made a family tree and displayed it at a family party, but she did not list Paulette or her children on the family tree. She also testified that the family occasionally would ask the couple why they would not get married, and they would respond that they did not want to "ruin a good thing." Furthermore, the wedding invitation for Paulette's daughter's wedding did not explicitly refer to Todd as Paulette's husband. There was also evidence that Todd's friends did not believe the parties were married. Furthermore, the evidence established that Todd and Paulette did not pool their assets or finances, they main-

tained separate checking accounts, they did not jointly own any vehicles, they did not have any joint credit cards, and they did not own any real property together.

It seems clear that the parties lived in a family-like relationship, that they had the reputation of living together in a long-term relationship, and that Paulette's children viewed Todd as a father. This, however, does not rise to the level of proving, by clear and convincing evidence, a general and uniform community belief that they were married. It is clear to us that the evidence about the parties' reputation in the community was mixed and subject to different interpretations. On various occasions Paulette presented herself and Todd as married to her business associates and people they met for the first time, but the majority of their friends and family, those individuals that constituted their community, did not believe they were married. None of Todd's family members testified that they believed Todd and Paulette were married. Furthermore, the evidence revealed that other than Paulette's business, in which she used the name Smith, public records and private accounts were in their own names as single persons. Even in Paulette's business, she did not begin to use the surname Smith until about ten years after she alleges the common-law marriage began. The reputation was, therefore, limited and inconsistent, and the evidence of a community belief certainly neither was clear nor convincing. We hold that the trial justice did not misconceive or overlook relevant evidence, nor was she clearly wrong when she found that Paulette did not meet her burden of establishing a common-law marriage. *See DeMelo,* 844 A.2d at 177. We fully comprehend the unhappy circumstances that surround the breakup of this relationship, but we must make our decision according to the principles of our well-settled law and not according to the unfortunate consequences of this case or any poor personal conduct of the defendant.

## Conclusion

For the foregoing reasons, we affirm the judgment of the Family Court. The record in this case shall be returned to that tribunal.