**Constance FRAVALA a/k/a Constance Fravala Phillips**

v.

**CITY OF CRANSTON, by and through its Director of Finance Jerome I. BARON.**

Nos. 2009–197–Appeal, 2009–225–Appeal.

Supreme Court of Rhode Island.

June 24, 2010.

Anthony S. Buglio, Esq., Warwick, for Plaintiff.

Timothy J. Robenhymer, Esq., Warwick, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The City of Cranston (the city) appeals from a Superior Court judgment declaring Constance Fravala (Constance)[1] to be the common-law wife of Wilbur Phillips (Wilbur) at the time of his death on October 25, 2004, and Constance cross-appeals[2] from the same judgment. These two cases came before the Supreme Court for oral argument pursuant to orders directing the parties to appear and show cause why the issues raised in these appeals should not summarily be decided. After examining the written and oral submissions of the parties, we conclude that these appeals may be resolved without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

Before Constance and Wilbur met each other, Constance was married to Donald Fravala (Donald), and Wilbur was married to Lillian Cantone (Lillian). Constance married Donald in 1957, and they had five children together. They were granted a divorce on June 17, 1968. Wilbur and Lillian were married in 1959 and had six children together. In 1967, Lillian was granted a divorce from "bed, board and future cohabitation" with Wilbur. It is uncontroverted, however, that this legal separation never was converted into a final decree of divorce from the bonds of marriage.

At some point after her separation from Wilbur, Lillian began cohabitating with Nicholas Barone (Nicholas). Lillian and Nicholas thereafter had two children together and cohabitated until her death on October 6, 1999.

For approximately thirty-five years, from 1969 until Wilbur's death in 2004, Constance and Wilbur cohabitated continuously in Rhode Island. They rented a home together in Cranston beginning in 1969, and, in 2000, they moved to Richmond. Constance's five children lived with them in Cranston beginning in 1969, when they were between the ages of approximately two and twelve years old, until they each reached the age of majority. Constance's grandson, Brandon, also lived with them from the time of his birth, in 1978, until the time of Wilbur's death. Wilbur was employed as a Cranston firefighter for approximately twenty years until he retired on August 2, 1985, and Constance worked for the city as a crossing guard for approximately twenty-four years.

Wilbur died on October 25, 2004. At the time of his death, Wilbur was duly collecting a pension from the city for his service as a firefighter. Upon Wilbur's death, Constance applied for a widow's pension, but the city denied her application. On April 7, 2006, Constance filed an action in Superior Court seeking a writ of mandamus and a mandatory injunction. She la-

---

1. We refer to the members of the Fravala and Phillips families by their first names for ease of setting forth the facts. No disrespect is intended.

2. We consolidate the appeal and the cross-appeal for purposes of this opinion.

ter filed a petition for declaratory relief, which the parties agreed to incorporate into her original complaint. Thereafter, the parties stipulated that Constance's request for a writ of mandamus and a mandatory injunction would be dismissed and the case would proceed solely on her request for declaratory judgment.

On March 9, 2009, before the jury-waived trial began, the city filed a motion *in limine* seeking to exclude evidence concerning the relationship between Constance and Wilbur prior to the death of Lillian on October 6, 1999. The city argued that such evidence should be excluded on the ground of relevancy under Rule 402 of the Rhode Island Rules of Evidence. The trial justice denied the motion, permitting Constance to present evidence at trial concerning her relationship with Wilbur before October 1999.

The trial took place on March 9 and 10, 2009. Constance was the first witness to testify at trial, and she testified at length about her relationship with Wilbur. She stated that she met Wilbur in the mid–1960s before her divorce from Donald and that she and Wilbur began cohabitating in 1969. She also testified that, around this time, Wilbur told her that he and Lillian were divorced.

Constance testified that during the thirty-five years she lived with Wilbur, neither of them dated other people; she also testified that they shared a bed and were intimate. She testified that they never lived separately for any length of time during those years. According to Constance, she and Wilbur also attended family functions, birthday parties, and weddings as a couple, and they went on vacations together at least once or twice a year.

Wilbur gave Constance two rings during their relationship, and Constance testified that one of the rings was given to her as an engagement ring around the time her youngest son was in high school, approximately sixteen years after they began cohabitating. She testified that after receiving the engagement ring she and Wilbur discussed getting married "just for a ceremony." Constance further testified that she and Wilbur "talked sometimes [about a formal marriage ceremony] and just one thing led to another, different things happened, [and they] just never [had a formal ceremony]."

Constance also testified about their finances. She testified that she contributed to household expenses from the income she earned as a crossing guard and that, when they were living and working in Cranston, they pooled their income and shared the payment of utilities and rent. She testified that after they both retired in 2000, they divided the payment of their bills—Wilbur paid for rent and utilities, and Constance paid for such things as food, her medical bills, incidentals, and gas. She was unable to recall whether she had a checking account in her own name between 1972 and 2000, but bank statements were introduced into evidence indicating that they had joint bank accounts in September 2001 and March 2004. They never filed joint tax returns because, as Constance testified, she had not known whether common-law-married couples were permitted to do so. Furthermore, Wilbur named Constance as the beneficiary of his life insurance policy and listed Constance as his emergency contact on a Medicare enrollment form.

At trial, a membership application for a Blue Cross & Blue Shield of Rhode Island policy, signed by Wilbur and dated July 31, 2001, was admitted into evidence. The application indicated that Wilbur was married to Constance in 1988, although Constance testified that the date had no significance to her.

Constance testified that she never had her name legally changed, but that she signed her name "Constance Fravala Phillips" on "some things" and signed her name "Constance Fravala" on other documents, for example, those pertaining to her children (who bore the last name Fravala). She testified at trial that a lease dated August 1, 2000 for their home in Richmond was signed "Wilbur Phillips" and "Constance Fravala Phillips," but that she used the surname "Fravala" on her credit union account, the bill for Wilbur's funeral expenses, and her driver's license.

Over the city's objection on the ground of hearsay, the trial justice permitted Constance to introduce photocopies of envelopes addressed to variations of "Mrs. Constance Phillips" and "Mr. and Mrs. Buddy Phillips." Constance was also permitted, over the objection of the city, to admit an affidavit of Robert DelGiaguite, a retired firefighter for the city, whom Constance testified she knew for twenty or thirty years, but who was deceased at the time of trial. The affidavit attested that Wilbur and Constance "lived together as a married couple * * * until [Wilbur] passed away * * *."

Constance testified that she provided the information to the newspaper for Wilbur's obituary and that she paid for his funeral expenses. The obituary stated that Wilbur was the husband of "Constance 'Connie' (Davidson) Fravala and the late Lillian (Cantone) Phillips." Wilbur's death certificate, however, lists Lillian Cantone as his spouse. Constance testified that she was told that one of Wilbur's daughters changed the designated spouse from Constance to Lillian.

Brandon Fravala, Constance's grandson, also testified at trial. He testified that he lived most of his life with both Constance and Wilbur and that they had raised him. He said that Wilbur took him to work at the fire station, fishing, and to bowling tournaments. He testified that he called Wilbur "Pop," "Gramps," or "Dad," that he introduced them to people as his grandparents, and that Wilbur referred to him as his grandson. He also testified that Constance and Wilbur shared a bed.

Constance's longtime friend, Cheryl Slavin, also testified at trial. She testified that Wilbur and Constance shared a bedroom and that their house had a "family atmosphere." She testified that she introduced them as "Connie and Bud Phi[l]lips" or "Connie and Bud Fravala." She also described Wilbur and Brandon as being "[v]ery, very close."

Thomas Morrocco, a retired firefighter for the city, and his wife, Gale Morrocco, both testified at trial about their friendship with Wilbur and Constance. Mr. and Ms. Morrocco met Wilbur and Constance through the Cranston Fire Department in the late–1960s. Mr. Morrocco recalled that Wilbur and Constance had been a couple for the approximately thirty-four years he had known them and that they held themselves out as a couple. He also testified that he had no knowledge of Wilbur ever "being" with any other women. Ms. Morrocco indicated that they socialized as couples and that she considered Wilbur and Constance to be a family unit. They both testified that the four of them had gone on vacations together.

Edward Murray, a retired employee of the Cranston Fire Department, testified that he saw Wilbur and Constance at social events sponsored by the fire department and that he believed them to be married. Another retired employee of the Cranston Fire Department, Robert Crossley, also testified at trial. He testified that he considered himself to be one of Wilbur's close friends and that he had socialized with the couple for over twenty years. He testified that he knew that Constance and Wilbur lived together, and he characterized them as a "couple." He further testified that he

had not known Wilbur or Constance to "be" with other women or men, respectively, and that he did not know of their living apart from each other.

Donald Palumbo, also a retired firefighter, testified that he knew Wilbur fairly well and that he knew Constance and Wilbur to be a couple for twenty-five or thirty years. Like the other retired firefighters, Mr. Palumbo testified that Wilbur treated Constance's children as though they were his own children, that he did not have knowledge of Constance or Wilbur "being" with other men or women, respectively, nor did he know of their living separately from each other.

Mr. Palumbo also testified about the affidavit of Robert DelGiaguite, which had been introduced into evidence by Constance. He testified that he knew the affiant, Mr. DelGiaguite, and that he had notarized the affidavit. Mr. Palumbo said that Mr. DelGiaguite was asked to prepare the affidavit and that he thereafter died. He further testified that he recognized the affidavit, had knowledge of Mr. DelGiaguite preparing the affidavit, and had witnessed him sign it in the absence of coercion. The affidavit thereafter was introduced into evidence as a full exhibit over the city's objection, and Mr. Palumbo read aloud a sentence of the affidavit stating Wilbur and Constance "lived together as a married couple until he passed away on October 25, 2004."

Three of Constance's children, Resa Cook, David Fravala, and Donald Fravala, testified. They each testified that Wilbur was a father figure during their childhood, bringing them on vacations and to the firehouse, attending parent-teacher conferences, and participating in Cub Scout activities. They each also testified that they referred to Wilbur as their father.

Resa Cook testified that she lived with Wilbur, Constance, and her siblings until 1985. She testified that Wilbur was more of a father figure than her biological father had been, stating that Wilbur walked her down the aisle when she got married. She also testified that Wilbur and Constance had shared a bedroom, that they never had separated, and that she was not aware of her mother dating other men. David Fravala testified that Wilbur's children would visit and that his family took trips to visit Wilbur's children. Donald Fravala testified that he knew Lillian as Wilbur's ex-wife.

The city then presented a single witness. Debra Santurri, an account clerk in the city's finance office, testified that she was employed in that position in October 2004, when Wilbur died. She stated that one of her duties was to send bereavement letters and affidavits to the surviving spouses of city pension recipients. A surviving spouse was asked to provide a copy of the death certificate and marriage certificate if he or she wanted to apply for a survivor's pension. On cross-examination, Ms. Santurri testified that if Constance was deemed eligible to collect Wilbur's pension, she would be entitled to receive $2,486.29 per month as of February 2009 and a lump sum of $119,308.22 for benefits accrued from the time of Wilbur's death through January 2009.

The trial justice rendered a decision from the bench on March 27, 2009. The trial justice recounted the facts adduced at trial and stated that she was "clearly convinced that [Constance] and Wilbur * * * intended to live together as husband and wife for over thirty-five years" and that Constance had "met her burden to prove by clear and convincing evidence that a common-law marriage existed between the parties at the time of Wilbur['s] death." She then concluded that a common-law marriage existed between Constance and Wilbur at the time of Wilbur's death and that this finding was supported by "clear and convincing evidence that the

parties mutually share[d] the requisite mutual intent to enter the husband-wife relationship which was proven by the testimony of Constance * * * as to the nature of their thirty-five-year relationship and their cohabitation, conduct, declarations to others and reputation among friends and family." The trial justice went on to declare that Constance was entitled to a widow's pension from the city as of the date of Wilbur's death in October 2004 through January 2009, and future monthly benefits during her lifetime. The trial justice denied Constance's request for prejudgment interest.

An order was entered on April 2, 2009, that was consistent with the bench decision. Judgment was entered that same day, (1) declaring Constance the common-law wife of Wilbur at the time of his death; (2) granting her widow's pension benefits of $119,308.22 from October 25, 2004 through January 31, 2009; (3) granting future monthly widow's pension benefits of $2,486.29 during her lifetime for the months February 2009 through June 2009, and thereafter in an amount to be determined by the terms of the pension agreement; and (4) denying Constance's request for prejudgment interest.

On April 28, 2009, a hearing was held on the city's motion for an order staying enforcement of the judgment, and the motion was granted conditionally, provided the issuance of a supersedeas bond pursuant to Rule 62 of the Superior Court Rules of Civil Procedure. Constance and the city filed timely cross-appeals.

## II

### Analysis

### A

### Evidentiary Rulings

#### 1. Motion *in Limine*

■ On appeal, the city argues that the trial justice erred in denying its motion *in limine* to exclude evidence of Constance and Wilbur's relationship prior to Lillian's death. It contends that the evidence should have been excluded because, as a matter of law, Constance and Wilbur could not have been married under the common law before Lillian's death in 1999, and therefore, such evidence was not relevant to Constance's claim.

In denying the motion *in limine*, the trial justice stated that "evidence of the relationship between the parties, namely [Constance and Wilbur], both prior to and after that date of death, are relevant to the existence of a common-law relationship * * *." She denied the motion without prejudice to the city, stating that it later could raise the argument that the evidence did not support a common-law marriage after Lillian's death. Moreover, the trial justice withheld judgment on the issue of the weight she would afford the evidence.

At the end of the trial, in considering the weight to be attributed to this evidence, the trial justice stated that the legal impediment created by Wilbur's marriage to Lillian "does not mean that [Constance] and Wilbur * * * did not intend to enter into a husband and wife relationship before [Lillian's] death. [T]he nature of their intent prior to [Lillian's] death in 1999 is certainly relevant to their intent thereafter[,]" because she found that "[n]othing [had] changed in terms of their intent or their relationship from the inception of their relationship in 1969 until [Wilbur's] death in 2004."

■ We review the grant or denial of a motion *in limine* for an abuse of discretion. *Owens v. Silvia*, 838 A.2d 881, 889 (R.I.2003). In its motion *in limine*, the city moved for exclusion of the evidence on the ground of relevancy. Such a determi-

nation "is within the sound discretion of the trial justice and, absent a showing of abuse of this discretion, this Court will not disturb a ruling concerning the admissibility of evidence." *Perrotti v. Gonicberg*, 877 A.2d 631, 642 (R.I.2005) (quoting *State v. Lynch*, 854 A.2d 1022, 1035 (R.I.2004)).

Given this deferential standard of review, we cannot say that the trial justice abused her discretion in ruling that evidence predating Lillian's death was relevant to the intent of Wilbur and Constance to enter into a husband-wife relationship. Although Wilbur did not have the capacity to enter into a valid common-law marriage with Constance, it was not error to conclude that the nature of his relationship with her during that time nevertheless was relevant. As the trial justice ultimately concluded, the evidence was relevant if Wilbur and Constance formed such intent prior to Lillian's death and it continued uninterrupted after her death.

■ Rhode Island is one of the few states that continues to recognize common-law marriage. *See Smith v. Smith*, 966 A.2d 109, 114 (R.I.2009); Charlotte K. Goldberg, *The Schemes of Adventuresses: The Abolition and Revival of Common–Law Marriage*, 13 Wm. & Mary J. Women & L. 483, 488 n.51 (2007) (noting that Rhode Island was one of only nine states recognizing common-law marriage at the time of the article's publication). Such a marriage "can be established by clear and convincing evidence that the parties seriously intended to enter into the husband-wife relationship * * * and that their conduct was of such a character as to lead to a belief in the community that they were married * * *." *Sardonis v. Sardonis*, 106 R.I. 469, 472, 261 A.2d 22, 24 (1970). The requisite intent and belief may be demonstrated by "inference from cohabitation, declarations, reputation among kindred and friends, and other competent circumstantial evidence." *Id.* Because intent of the parties is crucial in determining whether a common-law marriage exists, the conduct of the parties, even at a time when an impediment precludes the lawful existence of a common-law marriage, could be probative of the parties' intent after the impediment is removed. We cannot say, therefore, that the trial justice abused her discretion by admitting the challenged evidence in the case under review.

## 2. The Admission of the Envelopes and the Affidavit of Robert DelGiaguite

■ The city also argues that the trial justice erred in allowing the introduction of five envelopes addressed to variations of "Mrs. Constance Phillips" and the affidavit of Robert DelGiaguite because they constituted inadmissible hearsay.

■ It is well settled "that this Court applies a deferential standard when reviewing a trial justice's determination of the admissibility of evidence." *Accetta v. Provencal*, 962 A.2d 56, 60 (R.I.2009). "We will uphold the trial justice's ruling unless the trial justice clearly has abused his or her discretion and the evidence was 'both prejudicial and irrelevant.'" *Id.* (quoting *State v. Merida*, 960 A.2d 228, 234 (R.I.2008)).

■ Rule 801(c) of the Rhode Island Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The envelopes were offered, not to prove that Constance was in fact "Mrs. Phillips," but rather to prove that some members of the community addressed her by that name. When a statement is offered solely to show that the statement was made, not to prove the truth of the statement, then it need not

be excluded under Rule 801. Advisory Committee's Note to Rule 801(c); *see also Wells v. Uvex Winter Optical Inc.*, 635 A.2d 1188, 1193 (R.I.1994) ("Statements not offered to prove the truth of what they assert are not hearsay and as such do not require the assistance of an exception to the hearsay rule in order to be admissible") (quoting *In re Jean Marie W.*, 559 A.2d 625, 629 (R.I.1989)). The photocopies of the envelopes were admitted properly into evidence because they were relevant simply to demonstrate that there was a belief among some members of the community that the parties were married, *see Smith*, 966 A.2d at 116; and, as such, they did not constitute hearsay under Rule 801. Accordingly, we are satisfied that the trial justice did not abuse her discretion in admitting photocopies of the five envelopes offered to prove the community's perception of Wilbur and Constance's relationship.

Likewise, the affidavit of Robert DelGiaguite was properly admitted into evidence because it did not constitute hearsay under Rule 801. The affidavit was not offered to prove the truth of the matter asserted, namely, that Constance's name was a variation of "Mrs. Constance Phillips." Instead, the affidavit was offered to prove that members of their community viewed them as a married couple. We are satisfied, therefore, that the trial justice did not abuse her discretion in permitting the introduction of the affidavit.

## B

### The Weight of the Evidence

The city next argues on appeal that the trial justice misconstrued the evidence in concluding that a common-law marriage existed between Constance and Wilbur at the time of his death. Specifically, the city argues that: (1) the trial justice overlooked the evidentiary weaknesses in Constance's case; (2) the trial justice found a "family relationship" when she should have made a finding of a "husband-wife relationship" and was inappropriately "moved by the length of cohabitation and Mr. Phillips' relationship with Ms. Fravala's children and grandchildren"; (3) the trial justice erroneously stated in her bench decision that Constance testified that people referred to Wilbur and Constance as husband and wife; and (4) Wilbur's 2001 insurance membership application suggests that Wilbur did not believe that he and Constance were in a common-law marriage because he "was very careful to identify a year for the marriage and a maiden name."

On appeal, a trial justice's "decision granting or denying declaratory relief is reviewed with great deference by this Court." *Houde v. State*, 973 A.2d 493, 498 (R.I.2009) (quoting *Providence Lodge No. 3, Fraternal Order of Police v. Providence External Review Authority*, 951 A.2d 497, 502 (R.I.2008)). "It is well-established that 'the findings of fact of a trial justice, sitting without a jury, will be given great weight and will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong.' " *Id.* (quoting *Fleet National Bank v. 175 Post Road, LLC*, 851 A.2d 267, 273 (R.I. 2004)). Moreover, "the 'resolution of mixed questions of law and fact, as well as the inferences and conclusions drawn from the testimony and evidence, are entitled to the same deference.' " *Id.* (quoting *Narragansett Electric Co. v. Carbone*, 898 A.2d 87, 97 (R.I.2006)). "A trial justice's findings on questions of law, however, are reviewed *de novo.*" *Fleet National Bank*, 851 A.2d at 273.

We have reviewed the record carefully, and we conclude that the trial justice did

not overlook or misconceive material evidence or otherwise commit clear error. In her bench decision, the trial justice gave a detailed account of the evidence presented at trial, made findings about the weight she assigned the evidence, and applied the applicable law to her findings. Much of the evidence supporting the existence of a common-law marriage between Constance and Wilbur came from the testimony of Constance herself, and the trial justice clearly gave it great weight. The trial justice noted that "[w]hen this Court considers the credible testimony and demeanor of Constance * * * and the manner [in] which she described her relationship with Wilbur * * *, it is clearly convinced that she and Wilbur * * * intended to live together as husband and wife for over thirty-five years." She further stated that "while * * * there could be a risk that Constance * * * is perverting the facts to achieve a financial gain in the way of a pension, the defense never suggests that[,] and her story and demeanor and credibility as a witness suggest[ ] to this Court otherwise."

The trial justice found that Wilbur and Constance mutually intended to be husband and wife, specifically crediting Constance's testimony about the nature of their thirty-five-year cohabitation, conduct, declarations, and reputation in the community. The trial justice found credible Constance's testimony that the common-law marriage began when Wilbur and Constance moved in together and found that the couple had "cohabitated continuously with one another as a married couple for over thirty-five years." Significantly, the trial justice specifically found that Constance and Wilbur seriously intended to enter a husband-wife relationship from the inception of their relationship in 1969 and that such intent continued unabated after Lillian's death in 1999.

She further found that "throughout [Wilbur and Constance's] thirty-five years of being together they were never separated and not once did either party move out without the other party, nor did they go out with others in any kind of romantic relationship." The couple, according to the trial justice's findings, also "slept together and were intimate with each other to the exclusion of all others throughout their entire relationship." She further found that although "no marriage ceremony took place formally, the parties were as committed to one another for over thirty-five years as they would have been were they formally married[,]" noting that their relationship was arguably "a stronger relationship than many married couples today or over the course of time."

As to the couple's finances, the trial justice found that, before 2000, Constance and Wilbur "pooled their finances and paid the utilities, rent and other bills from this pool." After 2000, "they each had their own individual bank accounts and Wilbur * * * would pay the utilities and rent and [Constance] would pay for food expenses." The trial justice found, however, that Constance and Wilbur had not maintained entirely separate finances after 2000, that they owned joint shares in a credit union, and that they were joint borrowers on a loan.

The trial justice further relied on documentary evidence presented at trial in concluding that the couple intended to be in a husband-wife relationship. She noted that the lease for the home in which Constance and Wilbur had cohabitated was cosigned by the couple and had no specified term. Furthermore, the trial justice stated that Wilbur named Constance as "his primary beneficiary on his life insurance policy which confirms his intent to care and provide for her forever, even after his death." She also highlighted that Wilbur listed

Constance as his spouse on an insurance membership application in 2001, that both parties listed each other on important documents as emergency contacts, and that they were co-borrowers on loan applications.

Additionally, the trial justice found that there was "overwhelming evidence supporting the fact that the community recognized the parties to be in a husband-wife relationship for over thirty-five years." She stated that "[f]riends acknowledge[d] that they knew Constance * * * and Wilbur * * * much of their thirty-five years together and always recognized them to be a married couple even up until" Wilbur's death. The trial justice further concluded that the envelopes introduced at trial addressed to variations of "Mrs. Constance Phillips" were evidence that the community perceived them as a married couple.

It should be noted that the trial justice explicitly addressed the weaknesses of Constance's case, noting, "it is true that this Court lacks documentary evidence that the parties filed joint tax returns, listed themselves as married on other major legal documents, paid their bills jointly or co-mingled finances * * *." Furthermore, she noted that there was no evidence of whether Constance and Wilbur referred to themselves as husband and wife, and she highlighted that Wilbur's death certificate listed Lillian as his wife.

There can be no doubt that the trial justice gave some weight to the familial relationship that Wilbur shared with Constance's children and grandchildren and the length of time Wilbur and Constance cohabitated. However, we disagree that the trial justice erred in doing so. The trial justice found that Constance, Wilbur, and Constance's children "acted together as parents and children as a family unit, headed by a mother and father and husband and wife, with the only difference being the absence of a church wedding or formal marriage ceremony." The trial justice also recounted the testimony of Constance's grandson, Brandon, that he referred to Wilbur as "pop" or "dad," that he introduced Wilbur and Constance as his grandparents, and that Wilbur referred to Brandon as his grandson. The trial justice found this persuasive evidence that the community perceived Wilbur and Constance as a married couple. Ultimately, the trial justice stated that Constance and Wilbur "could be considered poster people for a traditional married couple, albeit without a marriage license."

Although not dispositive in proving the intent of the parties or belief in the community, these facts may be deemed relevant by a trial justice as circumstantial evidence tending to prove the elements necessary to establish a common-law marriage. *See Smith*, 966 A.2d at 114 (noting that the intent of the parties and belief in the community are "demonstrated by 'inference from cohabitation, declarations, reputation among kindred and friends, and other competent circumstantial evidence' ") (quoting *Sardonis*, 106 R.I. at 472, 261 A.2d at 24). The existence of a common-law marriage *vel non* is intrinsically a fact-intensive inquiry. Here, we conclude that, given the deference that this Court accords to the trial justice's inferences and conclusions drawn from the evidence and the trial justice's extensive findings of fact, we are satisfied that the trial justice did not overlook or misconceive material evidence or otherwise commit clear error.[3]

---

**3.** After making the aforementioned conclusions of fact and law concerning the current dispute, the trial justice made the following comment *sua sponte:* "The outdated doctrine of common-law marriage should be abrogated judicially with the rule being given prospective application only * * *." This issue has been neither briefed nor argued on appeal,

## C

### Prejudgment Interest

██ Constance contends in her appeal to this Court that the city breached its contract with both Local 1363 of the International Association of Fire Fighters and herself, as a beneficiary of the contract. Constance further contends that this Court repeatedly has held that prejudgment interest should be awarded, pursuant to G.L. 1956 § 9–21–10(a),[4] when a municipality acts in a proprietary or enterprise capacity. The city responds that the parties stipulated to the dismissal of count 1 and count 2 of Constance's complaint, seeking a writ of mandamus and a mandatory injunction sounding in breach of contract, thus allowing Constance to proceed only on her declaratory-judgment claim. The city argues that, because no breach-of-contract claim was at issue, Constance is not entitled to prejudgment interest under § 9–21–10.

Section 9–21–10(a) provides, in part, for prejudgment interest, "[i]n any civil action in which a verdict is rendered or a decision made for pecuniary damages * * *." Because a determination of benefits is not an award of damages, § 9–21–10 does not apply; and a plaintiff, therefore, will not be entitled to interest. *See Connelly v. Retirement Board of Providence,* 633 A.2d 1352, 1352 (R.I.1993) (mem.) (concluding that the award of accidental-disability benefits to plaintiff "was not an award of damages to which [§ 9–21–10] would apply"). *But see North Smithfield Teachers Association v. North Smithfield School Committee,* 461 A.2d 930, 934 (R.I.1983) (noting that a municipality is subject to an award of prejudgment interest pursuant to § 9–21–10 when the underlying action is for breach of contract).

In the present case, Constance's underlying action requested relief in the form of a declaratory judgment. Although both the prayer for a writ of mandamus and a mandatory injunction in Constance's original complaint sounded in breach of contract, the parties stipulated to the dismissal of that complaint, and her new petition for declaratory relief did not contain a breach-of-contract claim.[5] Constance successfully secured a declaration that she

---

however; accordingly, we decline to consider the continued vitality of the doctrine of common-law marriage in the context of this case. Moreover, the decision to abrogate such a long-established common-law doctrine *vel non* is more appropriately addressed by the General Assembly.

**4.** General Laws 1956 § 9–21–10(a) provides: "In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein. Post-judgment interest shall be calculated at the rate of twelve percent (12%) per annum and accrue on both the principal amount of the judgment and the prejudgment interest en-

tered therein. This section shall not apply until entry of judgment or to any contractual obligation where interest is already provided."

**5.** Constance's petition for declaratory judgment specifically requested the following relief:

"A. Judgment declaring Constance Fravala and Wilbur Phillips to have been in a common law marriage pursuant to the law of the State of Rhode Island;
"B. An order requiring the City of Cranston to make payment to Constance Fravala of the widow's pension benefits to which she is entitled, with interest;
"C. Attorney's fees and costs of this action;
"D. Any and all other relief which this court deems meet and just."

was entitled to widow's pension benefits. However, this determination of benefits, by way of a declaratory judgment, was not an award of damages. Constance therefore is not entitled to prejudgment interest under § 9–21–10(a). Accordingly, we affirm the judgment denying Constance prejudgment interest on her widow's pension.

## III

### Conclusion

For the foregoing reasons, we affirm the Superior Court judgment. The record may be remanded to the Superior Court.