Sofya M. ZHARKOVA

v.

Paul D. GAUDREAU.

No. 2011–295–Appeal.

Supreme Court of Rhode Island.

July 11, 2012.

---

Kurt M. Hayes, Esq., for Plaintiff.

Paul D. Gaudreau, Pro Se.

Present: SUTTELL, C.J.,
GOLDBERG, FLAHERTY, ROBINSON,
and INDEGLIA, JJ.

## OPINION

Justice ROBINSON, for the Court.

The plaintiff, Sofya M. Zharkova, appeals from a judgment of the Family Court dismissing her complaint for divorce against the defendant, Paul D. Gaudreau. In her complaint, the plaintiff alleged that a common-law marriage existed between the defendant and her. At trial, after hearing testimony from the parties and from several other witnesses, the trial justice found that the plaintiff had failed to prove the existence of a common-law marriage by clear and convincing evidence; accordingly, he dismissed the plaintiff's complaint.

On appeal, plaintiff contends that the trial justice's decision failed to do "substantial justice" between the parties and that the trial justice overlooked and/or misconceived relevant and material evidence or was otherwise "clearly wrong."

This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After reviewing the record and considering the written and oral submissions of the parties, we are satisfied that cause has not been shown and that this appeal may be resolved without further briefing or argument.

For the reasons set forth in this opinion, we affirm the judgment of the Family Court.

## I

### Facts and Travel

In March of 2010, plaintiff filed her complaint for divorce against defendant, alleging the presence of irreconcilable differences which had led to the irremediable breakdown of their marriage. She also alleged that their marriage had been at common law. The defendant denied all of the allegations set forth in the complaint, including the allegation that plaintiff and he had been married at common law.

A trial concerning the issue of whether or not plaintiff and defendant had been

married at common law began in Kent County Family Court on March 4, 2011. At that trial, each party testified and presented the testimony of several other witnesses as well as various exhibits.

## A

### The Testimony of Plaintiff

At trial, plaintiff testified that she had come from Ukraine to the United States with her husband and two daughters. She stated that she was divorced from that husband in Ukraine in 1999.

The plaintiff testified that she first met defendant in the Summer of 1997, when she was working as a volunteer at a company in Providence, to which company defendant was serving as a consultant. She further stated that her relationship with defendant became intimate in the Summer of 1998 and that that relationship resulted in defendant's moving in with her and her daughters. The plaintiff stated that she and defendant resided together continuously until their separation; she testified that her relationship with defendant ended "[o]fficially when [she] moved out of the house" in June of 2010. With respect to their separation, plaintiff stated that they "lived in the same house together until 2010[, but that they] separated as a husband and wife from 2009"

The plaintiff testified that, in the Spring or Summer of 2000 or 2001, she was having breakfast with defendant in Jamestown, when defendant "all of a sudden" said to her: "I love you. Will you marry me?" The plaintiff stated that she responded to defendant's proposal by saying: "What's the point?" She stated that by that response she meant the following: "We were already doing everything as a husband and wife. We have seven children between two of us." She went on to state (in reference to defendant) that she "was trying to understand and support him in his difficulties and he was doing the same to [her]." The plaintiff stated that, at that point in time, she would have called herself "wife" in her heart; she then added, however, that "what [she] was saying in [her] word could be different."

The plaintiff further testified that she attended family functions with defendant and would introduce him to her family and friends. The plaintiff stated that, when introducing defendant to persons with whom she was not familiar, she would call him her husband and that, when introducing defendant to members of her family who knew that they were not officially married, she would call him Paul. She proceeded to testify that defendant would introduce her as "his wife" or as his "wife Sofie or just Sofie without explanation."

The plaintiff further testified that, when she received cards from defendant, the cards would be addressed: "To my love, to my wife, to Sofya." Her attorney introduced a birthday card from defendant to plaintiff, which card stated: "I LOVE YOU more than life itself and still can't believe you agreed to marry me!" (That birthday card was marked as a full exhibit.)

On cross-examination by defendant's attorney, plaintiff testified that, when she and defendant began living together, they were both still officially married to other persons. She agreed that, as a result, it would be fair to say that, at that point in time, they were dating rather than married. The plaintiff testified that what she considered to be her common-law marriage to defendant began in either 2000 or 2001. She elaborated that she thought that they were in a common-law marriage when they began attending family functions of their respective families. The plaintiff testified that she believed that her marriage to defendant began when they

"start[ed] planning life together" and "[w]hen you start raising your children together." She added: "When you do stuff for your children together, that's where it begins." She further stated: "If you introduce man to your children, if you feel safe to bring him home, it is your husband." At the direction of defendant's attorney, plaintiff read into the record her answer to a question at her deposition as to when her common-law marriage began:

> "Well, as you know, I am new to this country and I don't know the rules and I never heard about common-law marriage before but it was, but it was always stated in Rhode Island one year you already married. Doesn't matter. That was my understanding that came from him."

The plaintiff also acknowledged on cross-examination that she was previously married and that she had to obtain paperwork prior to that marriage. She additionally affirmed that there was never a ring associated with her alleged marriage to defendant. The plaintiff also stated that she and defendant had never discussed having a wedding ceremony.

With respect to their finances, plaintiff testified on direct examination that there came a point in time when she and defendant began submitting their income tax returns to the federal government as spouses. She stated that, in 2005, she and defendant filed a joint return by specifying: "Married filed jointly." The plaintiff added that they did not file jointly prior to that year because of "financial reasons;" but she nonetheless testified that, prior to 2005, she had considered defendant to be her husband. It was plaintiff's further testimony that they had continued to file jointly through the year 2008.

The plaintiff's attorney also introduced a quitclaim deed (which was marked as a full exhibit); that deed refers to plaintiff and defendant as "husband and wife as tenants by the entirety." The plaintiff further testified that, at one point during their relationship, she had received health insurance coverage from defendant's company. She additionally stated that, with respect to her company's health plan, she listed defendant as being her spouse.

On cross-examination, plaintiff stated that, on the FAFSA[1] forms that she had filled out from 2000 through 2004 in connection with college tuition payments, she had indicated that her marital status was "Divorced." The plaintiff further acknowledged that defendant was not the beneficiary of her 401(k) and that they did not hold any joint bank accounts, savings accounts, or retirement accounts. She further acknowledged that, in 2004 and 2008, she had bought vehicles without asking for defendant's "permission."

**B**

**The Testimony of Certain Friends and Relatives of Plaintiff**

Vyacheslaw Snevchenko was called as the next witness by plaintiff. Mr. Snevchenko testified that he had known plaintiff and that he had met defendant. He testified that, in 2000 or 2001, plaintiff introduced defendant to him as her husband; he also acknowledged that defendant did not voice any objection to being called plaintiff's husband. Mr. Snevchenko stat-

---

1. The abbreviation FAFSA stands for the "Free Application for Federal Student Aid." *See* "FAFSA on the Web," Federal Student Aid, http://www.fafsa.ed.gov (last visited July 9, 2012). Federal Student Aid, "which is an office of the United States Department of Ed- ucation, ensures that all eligible individuals can benefit from federally funded financial assistance for education beyond high school." "About Federal Student Aid," Federal Student Aid, http://federalstudentaid.ed.gov/ about/index.html (last visited July 9, 2012).

ed that, as a result of that discussion with them, he had formed the belief that plaintiff and defendant were husband and wife.

Kathryn Mirica testified that she is plaintiff's daughter and that she had first met defendant in 1999, when she was seventeen. Ms. Mirica testified that plaintiff and defendant "lived as husband and wife." She further testified that they "called each other by name usually"—so that she was unable to "pinpoint specifically" whether defendant ever referred to plaintiff as his "wife." Nevertheless, she stated that she had been present when they introduced each other as husband and wife. On cross-examination, Ms. Mirica stated that, when she said that plaintiff and defendant "lived as husband and wife," she meant the following:

> "They lived in the same house. They slept in the same bedroom. I lived with them. I called Paul my stepdad. I would introduce him as my stepdad and [I] referred to him to my friends as stepfather. I considered his children [to be] my stepbrothers and sisters. We went to family gatherings together. We were a family." [2]

## C

### The Testimony of Defendant

The defendant then testified on his own behalf. He testified that he had previously been married twice and that those marriages had involved proposals, ceremonies, and rings. He testified that when he be-

gan living with plaintiff, it was "right about the same time" as his divorce from his second wife became final. He additionally testified that he had known that plaintiff was then in the process of finalizing her own divorce. The defendant stated that his intention at the point in time when he moved in with plaintiff was that they "could help each other out;" he added that, "at the worst case, we could help each other get through the tough times of being divorced and share expenses, stuff like that." The defendant characterized their relationship as "[c]ohabiting," and he stated that he and plaintiff "were friends." He then added that they were "friends with benefits." [3] When asked by his attorney whether he had loved plaintiff, defendant stated that "[t]here were times that the feelings grew close to that, but I would say we never wanted to get married, that's for sure * * *."

With respect to plaintiff's testimony concerning the alleged proposal in Jamestown, defendant stated that he had "no idea what she's talking about." The defendant admitted having gone to Beavertail (a location in Jamestown) "a few times," but he testified that he did not remember making any proposal. He stated that, if he had proposed, he would have bought a ring; he added that "then [he] would have made the proposal and follow[ed] the proper procedures." Immediately after making the just-quoted statements, defendant stated: "Of course I would remember it."

2. The plaintiff also called three additional witnesses whose testimony, for the sake of brevity, is not summarized in the text. In sum, those witnesses had met defendant through plaintiff, and they testified that the relationship between plaintiff and defendant was of the nature of a relationship between a husband and wife. None of those witnesses, however, testified to having heard plaintiff and defendant refer to each other as such.

3. On cross-examination, defendant elaborated as follows about the expression "friends with benefits" that is quoted in the text: "[It] comes from a TV show that we were joking [about]. I forget what show, maybe *Friends* but it's somebody that's your friend and you sleep with them. It is not a friend that you don't sleep with * * *."

The defendant testified that, from 2000 to 2005 (during which time period he bought a house with plaintiff), he had never considered plaintiff to be his wife. He further testified that he could not recall introducing plaintiff as his spouse or as his wife.

As to their finances, defendant testified that there was never an "official arrangement of how any finances would be handled," and he added that plaintiff and he never shared bank accounts. The defendant testified that plaintiff never asked him about purchasing a vehicle; he explained that it was unnecessary for her to ask for "permission" because she had her own money, bank accounts, and paychecks.

In addition, defendant confirmed that a pay stub issued in July of 2006 by his employer indicated that his marital status was "single." (That pay stub was entered as a full exhibit.) The defendant also testified that one of his daughters is the beneficiary under both his 401(k) plan and his life insurance policy.

The defendant further testified that, when he filed his tax returns jointly with plaintiff, he did not believe that he was married to her. He explained that they filed jointly because they thought that they would thereby be able "to save some money." He elaborated that one of his friends "had said that they did it and [that he or she] didn't have any problems;" he added that, for that reason, he thought that it was possible to file a joint return without being married.

With respect to the property that he and plaintiff owned as tenants by the entirety, defendant testified that, when plaintiff and he had been in the process of "refinancing three properties and [obtaining a] quit-claim deed," the attorney working on the transaction asked: "Do you want Sofie's name on the properties?" The defendant proceeded to testify that, after realizing that her name was already on "it," he said: "All right." He added that he "really didn't think much about it." He further stated that he knew that two people could own properties together when they were not married, but he said that he did not know about the "different terms." The defendant testified that he "didn't even realize that significance in that mark at that moment;" he added that at that time he was confronted with "a blizzard of papers." On cross-examination, defendant stated that, at the time when the deeds at issue were executed, he did not read all of the documents.

## D

### The Testimony of Defendant's Family and Friends

The defendant next called Paul E. Gaudreau, his father, to testify on his behalf. Mr. Gaudreau[4] testified that, for approximately ten years until the time of the parties' separation, he had known plaintiff as his son's girlfriend. Mr. Gaudreau proceeded to state that plaintiff and defendant were "basically friends, good friends;" he added that they vacationed together and held parties at their home together. Mr. Gaudreau stated that, when he was with plaintiff and defendant, he never heard plaintiff refer to defendant as her husband; indeed, Mr. Gaudreau stated that he "heard her correct people and say that she was just a girlfriend." Mr. Gaudreau further testified that his son always referred to plaintiff as his "girlfriend Sofya."

---

4. All references in this opinion to "Mr. Gaudreau" relate to Paul E. Gaudreau, defendant's father, and not to defendant himself.

Kelly Hayden next testified on behalf of defendant. Ms. Hayden stated that, at the time of the hearing, she was engaged to defendant's brother. She testified that, as a result, she would see plaintiff at family functions—such as parties, cookouts, and camping trips. Ms. Hayden testified that she "got along great" with plaintiff because they were "the girlfriends;" she added that they would "sit and chat" when they were together. Ms. Hayden stated that, on those occasions, she never heard plaintiff refer to defendant as her husband; on the contrary, she testified that plaintiff was "very adamant that she was—always was a girlfriend."

### E

### The Trial Justice's Decision

After considering the evidence and the arguments of the parties, the trial justice issued his bench decision on March 8, 2011. He preliminarily stated that common-law marriage had been recognized in Rhode Island since the 1800s, and he noted that the existence of such a marriage must be proved by "clear and convincing evidence."

The trial justice then reviewed the testimony of the witnesses, and he commented that plaintiff and defendant had the capacity to marry—"that is, they were not married to someone else." He stated that plaintiff believed that they were married whereas defendant believed that they were simply "friends with benefits."

The trial justice went on to note that "there must be a mutual present intent to be married." He noted that the quitclaim deed and some tax returns indicated that the parties were married. With respect to the deed, however, the trial justice noted defendant's testimony as to the "blizzard of documents to sign" and his denial of "knowing that th[e] deed was a conveyance to [him] and the Plaintiff as a married

couple." The trial justice additionally noted that, on plaintiff's FAFSA forms and the tax returns prior to 2005, plaintiff and defendant were not indicated as being married. The trial justice further noted that one of defendant's daughters is listed as his beneficiary under his 401(k) plan and his life insurance policy.

The trial justice additionally reviewed the testimony from those witnesses whom he viewed as being supportive of plaintiff's effort to "show a belief in the community that she and the Defendant were married to each other."

The trial justice found that plaintiff had proven the following facts by clear and convincing evidence: that the parties began a relationship sometime after they met in 1997; that the parties resided together in Pawtucket beginning in 1998; that, at the point in time when they first resided together, "neither party was free to marry as their respective divorces were not final;" that they continued to reside together until June of 2010, but had been "separated as a couple" for at least one year prior to that time; that the parties had filed separate tax returns until 2004; and that, beginning in 2005 and continuing until 2009, the parties filed joint tax returns "as married filed jointly."

The trial justice proceeded to state that he found defendant's testimony as to their reasons for filing tax returns jointly to be credible. He also deemed defendant's testimony as to "the relationship of the parties" to be credible.

The trial justice also found credible defendant's testimony that he never had the present intent to be married to plaintiff. He additionally stated that plaintiff had failed to prove by clear and convincing evidence that there was a general reputation in the community that plaintiff and defendant were husband and wife.

For those reasons, the trial justice concluded that plaintiff had failed to prove by clear and convincing evidence that she and defendant were married at common law. Accordingly, the trial justice dismissed plaintiff's complaint for divorce, which had alleged the existence of a common-law marriage to defendant. The plaintiff timely appealed.

On appeal, plaintiff contends that the trial justice overlooked and misconceived relevant evidence, was clearly wrong, and failed to achieve substantial justice when he concluded that a common-law marriage did not exist between the parties. The plaintiff asserts that the jointly-filed income tax returns, the testimony of her friend (Vyacheslaw Snevchenko) and her daughter (Kathryn Mirica), the wording on the birthday card from defendant to plaintiff, the health insurance coverage, and their property ownership as tenants by the entirety constituted sufficient evidence to establish that she and defendant were married at common law.

## II

### Standard of Review

 It is a basic principle that, in a divorce action, this Court will not disturb the findings of fact made by a trial justice sitting without a jury "unless he or she has misconceived the relevant evidence or was otherwise clearly wrong." *See DeAngelis v. DeAngelis*, 923 A.2d 1274, 1277 (R.I. 2007) (internal quotation marks omitted); *see also Palin v. Palin*, 41 A.3d 248, 253 (R.I.2012); *Smith v. Smith*, 966 A.2d 109, 114 (R.I.2009). Moreover, we will not disturb credibility determinations made by a trial justice in a nonjury trial "unless the findings are clearly wrong or the [trial

justice] misconceived or overlooked material evidence." *DeAngelis*, 923 A.2d at 1277 (alteration in original) (internal quotation marks omitted); *see also Opella v. Opella*, 896 A.2d 714, 718 (R.I.2006). As a result, "unless it is shown that the trial justice either improperly exercised his or her discretion or that there was an abuse thereof, this Court will not disturb the trial justice's findings." *Palin*, 41 A.3d at 253 (internal quotation marks omitted); *see also Koutroumanos v. Tzeremes*, 865 A.2d 1091, 1097 (R.I.2005). This Court, however, reviews in a de *novo* manner questions of law that are presented in an appeal from the Family Court. *Curry v. Curry*, 987 A.2d 233, 238 (R.I.2010); *see also Palin*, 41 A.3d at 253.

## III

### Analysis

 Rhode Island is one of the few states which continues to recognize common-law marriage. *Fravala v. City of Cranston ex rel. Baron*, 996 A.2d 696, 703 (R.I.2010); Charlotte K. Goldberg, *The Schemes of Adventuresses: The Abolition and Revival of Common–Law Marriage*, 13 Wm. & Mary J. Women & L. 483, 488 n.51 (2007) (recognizing Rhode Island as one of the nine states that, as of the time of the article's publication, still recognized commonlaw marriage).[5] The existence of such a marriage "must be established by clear and convincing evidence that the parties seriously intended to enter into the husband-wife relationship." *DeMelo v. Zompa*, 844 A.2d 174, 177 (R.I.2004) (internal quotation marks omitted); *see also Fravala*, 996 A.2d at 703; *Smith*, 966 A.2d at 114; *Sardonis v. Sardonis*, 106 R.I. 469, 472, 261 A.2d 22, 24 (1970); *Silva v. Merritt Chapman & Scott Corp.*, 52 R.I. 30, 32,

**5.** As we stated in *Fravala v. City of Cranston ex rel. Baron*, 996 A.2d 696 (R.I.2010), any "decision to abrogate such a long-established common-law doctrine *vel non* is more appropriately addressed by the General Assembly." *Id.* at 707 n. 3.

156 A. 512, 513 (1931). Additionally, in order to find the existence of such a marriage, the conduct of the parties must have been "of such a character as to lead to a belief in the community that they were married." *Sardonis*, 106 R.I. at 472, 261 A.2d at 24; *see also Smith*, 966 A.2d at 114. The just-mentioned requirements must be proven through "inference from cohabitation, declarations, reputation among kindred and friends, and other competent circumstantial evidence." *Smith*, 966 A.2d at 114 (internal quotation marks omitted). It should be noted, however, that a formal ceremony is not a prerequisite to the existence of a common-law marriage. *See id.* at 116.

## A

### Mutual Present Intent to be Husband and Wife

■ In order to establish a common-law marriage between defendant and herself, plaintiff was first required to provide clear and convincing evidence of each party's mutual present intent to be husband and wife. *See Smith*, 966 A.2d at 114. *See generally Odd Fellows' Beneficial Association of Rhode Island v. Carpenter*, 17 R.I. 720, 722, 24 A. 578, 578 (1892) ("In order to constitute a marriage *per verba de presenti* [*sic*], the parties must agree to become husband and wife *presently*. The consent which is the foundation and essence of the contract must be mutual and given at the same time * * *.").[6]

■ At the trial in the Family Court, plaintiff testified that defendant had proposed to her in Jamestown in 2000 or 2001. She testified that she replied to that proposal: "What's the point?" The plaintiff also testified that she believed that their marriage began in either 2000 or 2001, but she was unable to cite a specific date. She further stated that she believed that their marriage began when they began attending each other's family functions and when they started planning their life together.

By contrast, defendant testified that he did not recall proposing to plaintiff; he added that, if it had been his intention to become engaged, he would have purchased a ring and would have then made a proposal—steps which he characterized as being "the proper procedures." In addition, he consistently described their relationship as being in the category of "friends with benefits"—and not that of a married couple.

The trial justice found defendant's testimony as to his understanding of the nature of his relationship with plaintiff to be credible. Although a formal ceremony or engagement is not required for a common-law marriage to come into existence, the facts before us, coupled with the trial justice's credibility determinations, plainly do not constitute clear and convincing evidence of a mutual present intent to be husband and wife. *See Smith*, 966 A.2d at 116. Indeed, even plaintiff's testimony as to when she believed the common-law marriage to have come into existence is vague and inconsistent.

The plaintiff, however, places emphasis on their joint tax returns and on the deed that refers to plaintiff and defendant as "husband and wife as tenants by the entirety" in order to demonstrate that she and defendant both had the mutual present intent to be married. *In DeMelo*, 844 A.2d at 178, we indicated that the following were some of the facts which were indicative of a lack of clear and convincing evidence that the plaintiff had considered herself to be married: that she listed herself as "single" on her tax returns, on a

---

**6.** Black's Law Dictionary translates *per verba de praesenti* as follows: "By words in the present tense." Black's Law Dictionary 1261 (9th ed.2009).

mortgage application, and on insurance applications; that she did not designate defendant as a beneficiary on her 401(k); that their condominium was owned as tenants in common, not as tenants by the entirety, or even as joint tenants; and that the parties did not have any joint bank accounts. *See id.; see also Smith,* 966 A.2d at 115 (noting that the parties declared themselves single on legal documents and forms, including their tax returns); *Lovegrove v. McCutcheon,* 712 A.2d 874, 874 (R.I.1998) (mem.) (holding that the parties were not married at common law because the evidence revealed that the plaintiff consistently designated her marital status as "single" on employment applications, the home was purchased only in the defendant's name, and the parties did not pool their assets).

In the instant case, plaintiff and defendant indeed filed tax returns as "married filed jointly" for four years, and they also owned property as tenants by the entirety. However, defendant testified that they filed the joint returns as a result of a friend's advice that they would save money if they filed in that manner. With respect to the property which they owned as tenants by the entirety, defendant stated that, at the time when he was dealing with the property ownership documents, there was a "blizzard of papers" and he did not realize the significance of the term "tenancy by the entirety;" defendant in fact stated that he did not read all of the documents. The trial justice found defendant's explanations concerning the tax returns and the form of property ownership to be credible.

In contrast to the just-discussed evidence concerning the form of property ownership and the filing of joint tax returns, the parties neither held joint bank accounts nor discussed with each other the purchase of large items (*e.g.,* the vehicles that plaintiff purchased). In addition, plaintiff listed herself as divorced on the FAFSA forms, and she listed her daughter and not defendant as the beneficiary of her retirement account. The trial justice also noted that defendant listed a daughter, not plaintiff, as the beneficiary of his 401(k). Despite the joint tax returns and the form of property ownership, the testimony of defendant coupled with the other financial documents demonstrate the conflicting evidence as to whether plaintiff and defendant had a mutual present intent to be married. It is therefore our judgment that the trial justice did not clearly err in finding that there was no clear and convincing evidence of the intent to enter into a husband-wife relationship.

### B

### A Belief in the Community that the Parties Were Married

■ The plaintiff was also required to establish by clear and convincing evidence that there existed a belief in the community that she and defendant were married. *See Smith,* 966 A.2d at 116. Significantly, the reputation to be established "must be general and uniform." *Id.; see also Williams v. Herrick,* 21 R.I. 401, 403, 43 A. 1036, 1037 (1899).

■ The testimony presented as to such a belief in the community was insufficient to establish that there was a "general and uniform" reputation; instead, it is evident to us that the testimony indicated that the reputation of their relationship in the community varied significantly. *See Smith,* 966 A.2d at 117. The plaintiff indeed presented a number of witnesses in an effort to establish such a belief; however, the trial justice noted that only one of those witnesses could say that he was introduced to defendant by plaintiff "as her husband." In contrast to the testimony of plaintiff's witnesses, Ms. Hayden testified

that plaintiff was "very adamant" that she was defendant's "girlfriend;" Ms. Hayden added that she never heard plaintiff refer to defendant as her husband. The trial justice found Ms. Hayden's testimony to be "very credible and compelling." Moreover, plaintiff testified that she would introduce defendant as her husband only to persons whom she did not know well; and defendant testified that he had never introduced plaintiff as his wife. In light of the conflicting evidence and the trial justice's credibility determinations, the trial justice did not err in finding that plaintiff failed to prove by clear and convincing evidence that there was a general reputation in the community that plaintiff and defendant were husband and wife.

Accordingly, it is our judgment that the trial justice did not misconceive or overlook relevant evidence, nor was he clearly wrong when he found that the plaintiff failed to prove by clear and convincing evidence that a common-law marriage existed between herself and the defendant. *See Smith,* 966 A.2d at 117.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Family Court. The record may be returned to that tribunal.