June 11, 2018

|  |  |
|---|---|
| Angela Luis | : |
| v. | : |
| Kevin Gaugler. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Angela Luis            :

v.            :

Kevin Gaugler.        :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Indeglia, for the Court.**  The defendant, Kevin Gaugler (Kevin), appeals from a Providence County Family Court judgment granting the request of the plaintiff, Angela Luis (Angela), for a divorce.[1]  Angela alleged that she and Kevin, although not formally wed, were married at common law based on their intentions and conduct over the course of their twenty-three-year relationship.  This matter came before the Supreme Court on April 4, 2018, sitting at Lincoln High School, for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised should not be summarily decided.  After considering the arguments set forth in the parties' memoranda and at oral argument, we are convinced that cause has not been shown.  Thus, further argument or briefing is not required to decide this matter.  For the reasons set forth, we vacate the judgment of the Family Court and remand for proceedings consistent with this opinion.

---

[1] Throughout this opinion, we refer to the parties and the witnesses by their first names in the interest of clarity, intending no disrespect in doing so.

# I

## Facts and Travel

This appeal stems from the demise of Angela and Kevin's relationship, which culminated on July 9, 2013 when Angela filed for divorce. Having never had a wedding ceremony or obtained a marriage certificate, Angela and Kevin were never formally married. Angela claims, however, that their marriage had been one at common law.

Angela and Kevin lived together from May 1990 until June 2013, along with Angela's now-adult son, Zach. Although Zach is not Kevin's biological son, Kevin raised Zach from infancy as though he were his own son. Still, Kevin and Angela's relationship imploded in May 2013, when Angela saw Kevin kiss another woman. On the heels of this indiscretion, Angela ordered Kevin to vacate their shared abode. Angela filed a complaint for divorce in July. In that complaint, she asserted that she and Kevin had been married at common law since September 6, 1995, pinpointing that date as the one when she and Kevin decided to represent that they were husband and wife because Zach was beginning kindergarten.

On August 16, 2013, Kevin filed a motion to dismiss Angela's complaint for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Family Court Rules of Procedure for Domestic Relations, asserting that he and Angela were never married.[2] However, the trial justice reserved her ruling on that motion.[3] The trial began on January 29, 2014, and continued until

---

[2] He also later filed a motion to dismiss pursuant to Rule 37 of the Family Court Rules of Procedure for Domestic Relations.

[3] The record also reveals that on May 6, 2014, Kevin moved for a "directed verdict" on all issues related to common-law marriage. However, it is unclear whether the Family Court Rules of Procedure for Domestic Relations allow for such a motion. Nevertheless, the motion was denied.

March 31, 2015.[4]  In all, the trial spanned eleven days, during which numerous witnesses testified, including both Kevin and Angela.[5]  On March 22, 2016, the trial justice issued a decision wherein she denied Kevin's motion to dismiss, granted Angela's request for a divorce, and divided the relevant property largely equally between the parties.[6]  In the decision, the trial justice made 142 findings of fact, the majority of which supported her determination that there was clear and convincing evidence that Angela and Kevin were married at common law.

## A

### Angela's Testimony

At trial, Angela testified on her own behalf.  She recalled that, beginning in May 1990, she and Kevin lived together as boyfriend and girlfriend until Kevin proposed to her in December 1991.  In September 1995, Zach began kindergarten, and, according to Angela, she and Kevin agreed to "commit[] as husband and wife out in public * * *."  Angela explained that Zach has since referred to Kevin as "Dad."  She testified that she also began introducing Kevin as her husband at Zach's school in September 1995, including filling out forms listing Kevin as Zach's father and as her husband.

---

[4] The fragmented nature of the trial was due in part to the parties' unsuccessful attempt at mediation, as well as Angela's attorney's sudden withdrawal from the case.

[5] The trial justice indicated that the trial would be bifurcated: the first part would center on whether a common-law marriage existed, and, if necessary, the second part would be a divorce proceeding.

[6] Specifically, the trial justice ordered the parties to divide equally the proceeds from the sale of the "marital domicile" on Hobson Avenue; the personal household property in that home; "any and all retirement account(s)"; the cost of drafting a Qualified Domestic Relations Order; the value of Kevin's life insurance policy, which listed Angela as the primary beneficiary; and any property in their safe-deposit box.  The trial justice also adjudged that each party would be awarded all rights, title, and interest in their respective vehicles and any individually-held checking or savings accounts, and held each solely responsible for their own uninsured or underinsured medical costs, individually-incurred debt, and attorneys' fees.  Moreover, both parties were denied alimony, and Kevin was ordered to maintain Angela on his current health insurance.

Angela continued that, in September 1998, she and Kevin decided to purchase their shared home, but she chose not to be on the deed or the mortgage to preserve her credit rating. Kevin paid the mortgage, taxes, insurance, and utilities, while she paid for the groceries and Zach's expenses. She also testified that, prior to September 1995, Kevin began wearing a wedding ring on his left hand. She said that Kevin's family referred to her as "sister-in-law" or "daughter-in-law," Kevin's parents sent her a birthday card calling her their "favorite daughter-in-law," and Kevin introduced her as his wife at youth football. Angela also said that, in June 1998, Kevin began providing health insurance for Angela and Zach, dubbing Angela his "common law spouse." Moreover, in 2001, Kevin named her as the sole beneficiary and heir in his will and, in 2003, the sole beneficiary on his life insurance plan. However, Kevin's will did not name her as his wife. Kevin also designated Angela as the primary beneficiary of his 401(k) plan in December 2000 and again in February 2001, listing her as his "fiancée" each time.

Angela explained that, from 1990 until 2013, with the exception of 2008 and 2009, Kevin helped her prepare and file her tax returns. She stated that she always filed her taxes as "single" or "head of household," and that she and Kevin never filed joint tax returns. Kevin also never claimed Zach on his taxes. Angela further testified that, in 2008, she filled out a FAFSA[7] form seeking financial aid for Zach's college tuition, listing herself as "single"; she stated that she characterized herself as such because she and Kevin agreed that it would maximize Zach's potential financial aid.

Angela continued that she and Kevin had a joint bank account from 1995 until 1998, to which Kevin made contributions, but that since 1998 they had not shared a bank account. She also stated that she never used Kevin's last name and, when she went back to work in September

---

[7] "FAFSA" stands for the "Free Application for Federal Student Aid." *See* FEDERAL STUDENT AID, http://www.fafsa.ed.gov (last visited June 1, 2018).

2012, she indicated that she was "single" on relevant personnel forms. However, in October 2011, Angela represented herself as "married" on a dentist office questionnaire.

Angela further testified that she, Kevin, and Zach took family vacations, during which she and Kevin (and sometimes Zach) would share a bedroom. When not on vacation, she and Kevin shared a bedroom, but Kevin would sleep in the basement on weekends and on nights when he had been drinking.

Angela attested that, in 2000 and again in 2012, she confronted Kevin with allegations that he may have been unfaithful in their relationship, but she ultimately believed him when he denied her accusations. Then, on May 9, 2013, she saw him kiss another woman and confronted him; Kevin admitted that he was involved with the other woman and, in turn, Angela "threw [him] out" on June 7, 2013. Kevin moved into his girlfriend's home. Angela testified that, thereafter, she messaged Kevin saying "you gave me the engagement ring. Yes, we were to get married and things happened[.]"

**B**

**Kevin's Testimony**

Kevin also testified at trial. He echoed Angela's testimony that they lived together from May 1990 until June 2013, and that he had a father-son relationship with Zach. He further testified that in December 1991, he gave Angela an engagement ring and asked her to marry him, and that she agreed. Kevin stated that, although he agreed to conduct himself and represent himself as Zach's father, he did not consent to be Angela's husband, and he further said that he never referred to Angela as his wife.

According to Kevin, he bought himself a ring on a 1993 business trip and wore it on his left hand "on and off" until 2013. However, he said that he did not intend the ring to signify

marriage, and instead wore it on his left hand because he is right-handed. Kevin said that, while he did plan to marry Angela at some point in the future, he never considered himself married to her.

In 1995, 1996, and 1997, Kevin received "single" heath care coverage, but he designated Angela as his common-law spouse on his health insurance plan when she stopped working in 1998; Kevin maintained that he did so to ensure that Zach received health care coverage. In 2000, he listed Angela as the sole beneficiary of his 401(k) plan, characterizing her as his fiancée. Then, in 2003, he listed Angela as the primary beneficiary on his life insurance policy, characterizing her as his "wife." He stated that he did so only because the human resources department at work told him that his life insurance policy needed to match his health care policy. Further, Kevin admitted that he knew he was lying when he listed Angela as his spouse on his health insurance for fifteen years. In addition, Kevin represented that he consistently listed his marital status as "single" for his pay status at work.

Kevin indicated that he purchased his and Angela's shared home in September 1998 and that Angela did not contribute to the purchase price, nor was she listed on the deed or the mortgage. Angela was present at the closing of the home and was shown the mortgage deed by the closing attorney, which stated that the grantee was "Kevin Gaugler, an unmarried man." Kevin paid all the bills associated with the home, while Angela paid only for the groceries. Further, he testified that the two had not shared a bedroom since 2008.

Kevin stated that he did not help Angela prepare her taxes from 1995 to 2010, but that he did in 2010, 2011, and 2012. According to Kevin, when he helped prepare Angela's taxes, he included her representation that she was "head of household" only because that was the designation that Angela had used in previous years. Kevin also filed as "single" from 1995 until

he purchased their home. Moreover, Kevin testified that he went with Angela to prepare Zach's FAFSA application, and there Angela told him to say that he was just her friend. He also said that he later paid the balance on Zach's college tuition.

Kevin alleged that, from 1990 until 2008, Angela cooked, cleaned, and did laundry for him, but she stopped in 2008 when she quit her job. He also testified that he and Angela had no joint credit cards and never jointly owned a motor vehicle; he added that he never paid the taxes on Angela's vehicles, but he did pay off her vehicle loan. He submitted that Angela similarly did not pay the taxes on his vehicles.

## C

### Testimony of Family, Friends, and Acquaintances

Various other persons testified during trial as well. First, Lynn A. Poissant, an acquaintance of Kevin, testified that she believed that Kevin and Angela were married, addressing a December 2012 holiday card to "Mr. and Mrs. Kevin Gaugler and Son."

Next, Darlene Gaugler, Kevin's sister, testified that Kevin updated his will in May 2005, removing Angela as the beneficiary, and she further testified that Kevin specifically told her that he and Angela were not getting married. Darlene had also testified that, although Angela was listed as Kevin's spouse in their mother's 2008 obituary, Darlene had told the funeral director that Angela was Kevin's "companion" and the funeral director erred in characterizing Angela as Kevin's spouse.

Linda L. Ouellette, Angela's co-worker, testified that, in 2006, Angela introduced Kevin to her as her husband, and Kevin did not correct her; Linda further testified that she always believed that they were married. Then, Jennifer Oliver, Angela's niece, testified that Kevin, Angela, and Zach acted as a family. Next, Maria Oliver, Angela's sister, testified that, even

without a formal wedding ceremony, she considered Kevin and Angela married, referring to them as husband and wife, and that their neighbors also referred to them as married. Maria also testified that she was aware that title to Angela and Kevin's home was recorded in only Kevin's name.

Jose M. Luis, Angela's brother, testified next. He explained that he referred to Kevin as his "brother-in-law" and had observed Angela and Kevin conduct themselves as a "normal married couple." Jose also testified that he often heard Kevin and Angela refer to each other as "husband" and "wife."

Scott Martin, Kevin's acquaintance, testified that Kevin never told him that he had a wife. Next, Shelly Conaty, the record keeper for Kevin and Angela's primary care doctor, testified that Kevin listed his marital status as "common law" on a demographic sheet in 1997, which he never sought to change despite being asked if he wanted to update his status, and that Kevin also listed Angela as his emergency contact and his "spouse/partner." Thereafter, Paula Goncalves, Kevin and Angela's neighbor, testified that Kevin specifically told her in 1998 that "his wife spoke Portuguese," subsequently introducing Angela to her as his wife.

Luisa Luis, Angela's sister, testified that, in 1993, Kevin introduced her to his co-workers as his "sister-in-law" and that she similarly introduced Kevin as her "brother-in-law." John Vivari, Kevin's co-worker, testified that he had worked with Kevin since 2001 and "in either 2006, 2008 or 2012 or 2013" Kevin told him that Angela was not his wife and that he and Angela kept separate finances.

## D

## Trial Justice's Decision

Relying on the trial testimony, the trial justice found by clear and convincing evidence that Kevin and Angela were married at common law since September 1995, concluding that Kevin's testimony was largely incredible and Angela's testimony was mostly credible. A decision pending entry of final judgment to that effect was entered on June 3, 2016. On June 17, 2016, Kevin timely appealed that judgment to this Court, arguing that the trial justice misconceived the evidence in finding that he and Angela had a present and mutual intent to be husband and wife.

## II

## Standard of Review

"It is well-established that the findings of fact of a trial justice, sitting without a jury, will be given great weight and will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." *Fravala v. City of Cranston ex rel. Baron*, 996 A.2d 696, 704 (R.I. 2010) (quoting *Houde v. State*, 973 A.2d 493, 498 (R.I. 2009)). "As a result, 'unless it is shown that the trial justice either improperly exercised his or her discretion or that there was an abuse thereof, this Court will not disturb the trial justice's findings.'" *Zharkova v. Gaudreau*, 45 A.3d 1282, 1290 (R.I. 2012) (quoting *Palin v. Palin*, 41 A.3d 248, 253 (R.I. 2012)). "This Court, however, reviews in a *de novo* manner questions of law that are presented in an appeal from the Family Court." *Id*. Further, "to establish a common-law marriage, we have adopted the clear and convincing standard of proof." *Smith v. Smith*, 966 A.2d 109, 114 (R.I. 2009).

**Discussion**

Common-law marriage is "defined as a marriage which does not depend for its validity upon any religious or civil ceremony but is created by the consent of the parties as any other contract." Otto E. Koegel, D.C.L., *Common Law Marriage and its Development in the United States* 7 (1922). It "expanded to western America in the nineteenth century due to the lack of religious officials to perform marriage ceremonies and the difficulty of traveling." Jennifer Thomas, *Common Law Marriage*, 22 J. Am. Acad. Matrim. Law. 151, 155 (2009). "Recognition of common[-]law marriage in western colonies [in America] allowed for the passage of property upon death and allowed the children to be legitimized." *Id.* at 156. There are a number of documented reasons why common-law marriage was adopted by state courts in the United States: (1) marriage was considered a natural right granted to every person; (2) marriage was favored over illicit relationships; (3) children born out of wedlock were considered illegitimate and, therefore, did not enjoy certain legal protections; and (4) concern that women would become economically dependent upon the state. *Id.* at 156, 157.

Before we begin our analysis, we underscore that the case at bar is not the first time that we have been presented with an issue concerning common-law marriage. *See, e.g.*, *Fravala*, 996 A.2d at 704. Neither is this the first time that we have noted that it is within the General Assembly's power to revisit and reevaluate this arguably outmoded doctrine. *Id.* at 707 n.3 ("[T]he decision to abrogate such a long-established common-law doctrine *vel non* is more appropriately addressed by the General Assembly."); *see also Zharkova*, 45 A.3d at 1290 n.5. In

consideration of the modern fluidity of family units, we again call upon the General Assembly to determine this doctrine's place in Rhode Island's jurisprudence.[8]

However, because common-law marriage remains the law in Rhode Island, to prove it "we have adopted the clear and convincing standard of proof."[9] *Smith*, 966 A.2d at 114. "The existence of a common-law marriage *vel non* is intrinsically a fact-intensive inquiry." *Fravala*, 996 A.2d at 706. The required showings are that (1) the parties had the capacity to marry; (2) the parties seriously intended to enter into a mutual husband-wife relationship; and (3) the parties' conduct was of such a character so as to lead to a belief in the community that they were married. *Zharkova*, 45 A.3d at 1290-91; *Petrarca v. Castrovillari*, 448 A.2d 1286, 1289 (R.I. 1982). We address each in turn.

## A

### Capacity to Marry

This Court has proclaimed "that the party seeking to prove the existence of a common-law marriage must at the very least present evidence that he or she had the capacity to enter into

---

[8] Kevin's counsel said it well in Kevin's Rule 12A statement: "[I]n light of society's widespread acceptance of couples choosing to live together and raise a family together without the requirement of a marriage certificate further demonstrates how unlikely it is to jump to the conclusion that such couples intend to be married." At last count, Rhode Island is one of only nine states to recognize the doctrine. Sarah Primrose, *The Decline of Common Law Marriage & the Unrecognized Cultural Effect*, 34 Whittier L. Rev. 187, 190 (2013).

[9]

> "Clear and convincing evidence is defined in a variety of ways; for example, to establish a fact or an element by clear and convincing evidence a party must persuade the jury that the proposition is highly probable, or must produce in the mind of the factfinder a firm belief or conviction that the allegations in question are true. The clear and convincing evidence standard does not require that the evidence negate all reasonable doubt or that the evidence must be uncontroverted." *Rhode Island Mobile Sportfishermen, Inc. v. Nope's Island Conservation Association, Inc.*, 59 A.3d 112, 121 n.16 (R.I. 2013) (quoting *Cahill v. Morrow*, 11 A.3d 82, 88 n.7 (R.I. 2011)).

the marriage." *Petrarca*, 448 A.2d at 1289. In this case, neither of the parties contests their capacity to marry, and thus we can hastily decide that this showing is satisfied.

**B**

**Serious Intent to Enter into a Husband-Wife Relationship**

"A common-law marriage [also] requires 'evidence that the parties seriously intended to enter into the husband-wife relationship.'" *Smith*, 966 A.2d at 114 (quoting *Sardonis v. Sardonis*, 106 R.I. 469, 472, 261 A.2d 22, 24 (R.I. 1970)). To that end, "the parties must *mutually* and *presently* intend to be husband and wife rather than merely become engaged to be husband and wife at some point in the future." *Id.*

In *Fravala* we held that a trial justice did not err in determining that a couple was married at common law. *Fravala*, 996 A.2d at 706. In that case, the trial justice highlighted that the couple had pooled their finances, owned joint shares in a credit union, and were joint borrowers on a loan. *Id.* at 705. Further, the couple had co-signed a lease for their shared home. *Id.* The trial justice concluded that the couple "could be considered poster people for a traditional married couple, albeit without a marriage license." *Id.* at 706. In contrast, in *Zharkova*, we held that the trial justice did not clearly err in holding that the couple in that case was not married at common law. *Zharkova*, 45 A.3d at 1292. There, the plaintiff argued that the couple's jointly-filed tax returns, on which they identified themselves as "married," and a property deed referring to them as "husband and wife as tenants by the entirety" sufficiently satisfied the clear and convincing evidence benchmark. *Id.* at 1291, 1292. Yet, we upheld the trial justice's decision, because he believed the defendant's testimony that the couple filed their tax returns as "married" in the interest of economy alone. *Id.* at 1292. The trial justice in *Zharkova* also relied on the fact that the parties "neither held joint bank accounts nor discussed with each other the purchase of

large items[.]" *Id.* In addition, the trial justice found it persuasive that the plaintiff characterized herself as "divorced" on her daughter's FAFSA forms and listed her daughter (and not the defendant) as beneficiary of her retirement account. *Id.*

It has been said that "there are few areas of the law in black and white[,]" and common-law marriage is certainly one of those nebulous areas, as exemplified by the aforementioned cases. *Estin v. Estin*, 334 U.S. 541, 545 (1948). "The greys are dominant and even among them the shades are innumerable. For the eternal problem of the law is one of making accommodations between conflicting interests. This is why most legal problems end as questions of degree." *Id.* Here, even giving the trial justice's factual findings their due deference, we are not persuaded that her findings amount to "clear and convincing" evidence. *See Smith*, 966 A.2d at 114.

"At best, * * * the evidence in this case is conflicting." *Smith*, 966 A.2d at 115. The trial justice recognized that Kevin did not name Angela as his wife in his will; and, even though he designated her as the primary beneficiary on his 401(k) plan, he labeled her as his "fiancée." Further, she found that Angela repeatedly declared herself to be "single" or "head of household" under penalty of perjury, on her tax return forms, and that Angela and Kevin never filed joint tax returns. *See id.* (holding that the trial justice correctly concluded that the parties' declaring themselves as single on legal documents and forms, including tax returns, "strongly weighed against any serious intent to be husband and wife"). Moreover, the trial justice also concluded that, in addition to labeling herself as "single" on her tax return forms, Angela also characterized herself as such on Zach's FAFSA paperwork. *See DeMelo v. Zompa*, 844 A.2d 174, 178 (R.I. 2004) (holding that there was a lack of clear and convincing evidence where "[t]here were many documents introduced in evidence, such as tax returns, a mortgage application, and insurance

applications in which she listed herself as single[,]" "[the] defendant was not designated as a beneficiary on her pension or 401(k)[,]" and "their condominium was owned as tenants in common, not as tenants by the entirety, or even joint tenants[,]" nor did the parties jointly hold bank accounts). In the past, we have said that similar "declarations strongly weighed against any serious intent to be husband and wife." *Smith*, 966 A.2d at 115; *see also Lovegrove v. McCutcheon*, 712 A.2d 874, 874 (R.I. 1998) (mem.) (holding that the trial justice was not clearly wrong in concluding that the parties were not married at common law where plaintiff consistently listed her marital status on employment applications as "single," the home that the parties resided in was purchased in defendant's name alone, and the parties did not pool their assets). It is our opinion that the trial justice in the present case, in spite of the parties' declarations, miscalculated that the evidence was clear and convincing.

Our review of the trial justice's findings reveals that the parties in this case labeled themselves as married when it benefited them, such as on Kevin's health insurance paperwork, and refrained from doing so when it did not, such as on Zach's FAFSA paperwork. Further, the trial justice determined that Kevin and Angela had not shared a joint bank account since 1998 and did not pool their finances to make large purchases together, as evidenced by Kevin's purchasing the home that they lived in together with only his money and only in his name. *See Zharkova*, 45 A.3d at 1292. The evidence of a common-law marriage can only be described as inconsistent in this case, and thus is insufficient to meet the heightened standard of proof. *See Smith*, 966 A.2d at 115.

The trial justice's findings do not reflect that Angela and Kevin had a serious, mutual intent to be husband and wife. Kevin points out that the trial justice did not comment on

- 14 -

Angela's testimony referring to Zach's first day of school when she told his teachers that Kevin was his father and that she and Kevin were married. She testified:

> "Q. And there were no documents you signed that day that said you were married to Kevin, it's a verbal thing; isn't that right?
> "A. Correct.
> "Q. And at that time you didn't tell Kevin that's what you were going to do that day; isn't that true?
> "A. Not that first day of school.
> "Q. Right. And when you went in you did it because you wanted [Zach] to feel like he was part of the family; isn't that right?
> "A. Correct. That's what any child wants."

The fact that the trial justice overlooked this testimony illuminates her error in holding that Kevin and Angela had a mutual and present intent to be married at common law in that Kevin was unaware that Angela planned to represent herself as such.[10] *See Smith*, 966 A.2d at 114 ("The consent which is the foundation and essence of the contract must be mutual and given at the same time * * *.") (quoting *Odd Fellows' Beneficial Association of Rhode Island v. Carpenter*, 17 R.I. 720, 722, 24 A. 578, 578 (1892)).

The trial justice concluded that, during "their twenty-three (23) years together, both Angela and Kevin 'cherry picked' where, when and how they would portray themselves as married, single or other. On any given form or document their choice of a marital or non-marital designation hinged solely upon what they agreed would be most financially advantageous." Basing her decision, at least in part, on the principle that common-law marriage is rooted in equity, the trial justice determined that to "find that [Kevin] and Angela were not married by common law would not only defy the economic reasons which underlie the basic foundation of forming a common law marriage, but more importantly it would fly in the face of equity."

---

[10] In fact, Kevin has maintained that he only learned as a result of these proceedings that Angela considered them married at common law as of that September 1995 date.

An examination of the record indicates that the trial justice was correct in her observation that Angela and Kevin "cherry picked" how they would portray their relationship based on how it would immediately benefit them. But our conclusion is that the record evinces only Kevin and Angela's intent to sporadically represent their relationship, and not their serious intent to be husband and wife. *See Smith*, 966 A.2d at 117. "The clear and convincing standard of proof requires the trial justice to have a clear conviction without hesitancy of the truth of the precise facts in issue." *In re Kurt H.*, 152 A.3d 408, 411 (R.I. 2017) (quoting *In re Jermaine H.*, 9 A.3d 1227, 1231 (R.I. 2010)). Because the trial justice held that there was a common-law marriage despite her recognition that Kevin and Angela made consistently oscillating representations, we hold that she misconceived that the weight of the evidence was clear and convincing.

In sum, because the trial justice's factual findings do not represent "a firm belief or conviction" that Kevin and Angela seriously intended to enter into a mutual husband and wife relationship, we hold that the trial justice misconceived the evidence in so holding. *Rhode Island Mobile Sportfishermen, Inc. v. Nope's Island Conservation Association, Inc.*, 59 A.3d 112, 121 n.16 (R.I. 2013) (quoting *Cahill v. Morrow*, 11 A.3d 82, 88 n.7 (R.I. 2011)).[11]

## IV

### Conclusion

Based on the foregoing reasons, we vacate the judgment of the Family Court and remand for proceedings consistent with this opinion.

---

[11] Because we hold that the trial justice's factual findings are lacking with regard to the parties' present and mutual intent to be husband and wife, it is unnecessary for us to address the final factor concerning the general and uniform belief in the community.

Kevin also argued that the trial justice erred in her equitable distribution of the assets because she previously had ruled that the trial would be bifurcated. However, based on our holding that Kevin and Angela were not married at common law, we similarly need not address that issue.

- 16 -

**Justice Robinson, dissenting.** I respectfully but unreservedly dissent. In my judgment, the majority has erred: (1) in underestimating the probative force of the meticulous and voluminous fact-finding carried out by the trial justice (including numerous very explicit credibility determinations); and (2) in opining that, "even giving the trial justice's factual findings their due deference, we are not persuaded that her findings amount to 'clear and convincing' evidence [of a common law marriage]." It is my definite view that the trial justice's findings of fact and her determinations about credibility *do* very clearly and much more than sufficiently constitute a basis for her ultimate holding that there was clear and convincing evidence of the existence of a common law marriage between Angela Luis and Kevin Gaugler. I usually view legal issues in a rather nuanced manner, often reaching a decision in a "*dubitante*" frame of mind; but, in this instance, I am unable even to concede that the question is close. I am entirely convinced that the trial justice "got it right;" and, while I accept the fact that my esteemed colleagues see things differently, I confess to being almost nonplussed as I regard their conclusion—especially when I recall the great deference that this Court regularly accords to the fact-finding and credibility determinations of trial justices.

Time and time again this Court has emphasized the deference that we owe to the factual findings of trial justices—perhaps most especially in the context of a non-jury trial. *See, e.g.*, *Cullen v. Tarini*, 15 A.3d 968, 976 (R.I. 2011) ("A judgment in a nonjury case will be reversed on appeal [only] when it can be shown that the trial justice misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong.") (internal quotation marks omitted); *B.S. International Ltd. v. JMAM, LLC*, 13 A.3d 1057, 1062 (R.I. 2011) ("We apply a deferential standard of review with respect to the factual findings of a trial justice

sitting without a jury in a civil case."); *In re Dissolution of Anderson, Zangari & Bossian*, 888 A.2d 973, 975 (R.I. 2006) ("The findings of fact by a trial justice sitting without a jury are entitled to great weight and shall not be disturbed on appeal unless the record shows that the findings are clearly wrong or unless the trial justice overlooked or misconceived material evidence on a controlling issue.") (internal quotation marks omitted); *DeMelo v. Zompa*, 844 A.2d 174, 177 (R.I. 2004) ("In divorce actions, the findings of fact by a trial justice sitting without a jury are entitled to great weight and will not be disturbed by this Court on appeal unless the trial justice misconceived or overlooked relevant evidence or was clearly wrong."); *see also Federal Communications Commission v. Fox Television Stations, Inc.*, 556 U.S. 502, 529 (2009) ("This Court * * * is one of final review, not of first view.") (internal quotation marks omitted).[1]

While my respect for my colleagues in the majority is genuine, I am nonetheless of the view that the majority appears to have engaged in its own differential weighing of the evidence as though it were acting as a *nisi prius* court. I acknowledge the possibility that, in this case, in which the "clear and convincing" standard applies, a reasonable trial justice might conceivably, *on the basis of the different weight that he or she might accord* to the testimony and other evidence in the record, reach a different conclusion as to the existence *vel non* of a common law

---

[1]     This principle of deference to the trial justice is acknowledged in the majority opinion, which, in the "Standard of Review" section, quotes with approval the following language from the case of *Fravala v. City of Cranston ex rel. Baron*, 996 A.2d 696, 704 (R.I. 2010): "It is well-established that the findings of fact of a trial justice, sitting without a jury, will be given great weight and will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." (Internal quotation marks omitted.)

marriage.[2]  But I do not concede that the trial justice in this case reversibly erred in reaching the conclusion that she reached.[3]

It is certainly possible that one or more members of this Court, if sitting in a *nisi prius* capacity, might have assessed the evidence differently—might have accorded more or less weight to one or other piece of evidence or might have made different credibility determinations.[4]  And that differential weighing might have affected the ultimate conclusion of that hypothetical judicial officer as to whether there was "clear and convincing evidence" of the

---

[2]  I want to be very clear.  I could countenance a ruling that there was no common law marriage *only if* such a ruling were based upon fact-finding and credibility assessments that differed greatly from those actually made by the trial justice in this case.

[3]  The following sentence from the trial justice's lengthy and fact-filled decision nicely summarizes her conclusion:

> "After thoughtful review of all the testimony presented, as well as the exhibits offered, this Court, by clear and convincing evidence, finds that the evidence presented is sufficient to prove Plaintiff Angela's claims that she and Kevin held themselves out to the community as husband and wife which led to an existence of a general and uniform belief and reputation in the community that they were married."

[4]  The number of highly specific credibility determinations made by the trial justice in her "Findings of Fact" is noteworthy.

Simply by way of example, I would quote the positive credibility determination that is reflected in Finding No. 16:

> "Angela's testimony that when Zach entered school in September 1995 that she and Kevin had a mutual present intent to change their relationship and to begin living as husband and wife to form a traditional family for the benefit of Zach is very credible[.]"

And, by way of contrast, I would quote the negative credibility determination that is reflected in Finding No. 35 (regarding testimony from a witness presented by Mr. Gaugler):

> "Ms. Gaugler's testimony that Kevin specifically told her that he and Angela were not getting married is believed by this Court to be a complete fabrication[.]"

existence of a common law marriage. But such weighing is not properly the role of an appellate court. Rather, we have said: "If on review it becomes clear to us that the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his [or hers] even though a contrary conclusion could have been reached." *School Committee of City of Cranston v. Bergin-Andrews*, 984 A.2d 629, 648-49 (R.I. 2009) (internal quotation marks omitted); *see also State v. Gillespie*, 960 A.2d 969, 980 (R.I. 2008) ("[W]e may uphold a trial justice's ruling even if we would have ruled differently had we been in the trial justice's position."); *North Providence School Committee v. North Providence Federation of Teachers, Local 920, American Federation of Teachers*, 945 A.2d 339, 345 n.10 (R.I. 2008); *see generally National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642 (1976) ("The question, of course, is not whether this Court, or whether the Court of Appeals, would as an original matter have dismissed the action; it is whether the District Court abused its discretion in so doing.").

The majority notes the conflicting nature of the evidence in this case, and it points to inconsistencies in the testimony. But there is nothing new about there being inconsistencies in witness testimony. *See State v. Jensen*, 40 A.3d 771, 781 (R.I. 2012) ("[T]he presence of some inconsistencies between or among utterances of a witness or witnesses at different points in time does not *ipso facto* render the testimony unworthy of belief."); *see also State v. Cerda*, 957 A.2d 382, 386 (R.I. 2008). The trial justice candidly recognized that the evidence was certainly not all of one piece, and her "Findings of Fact" clearly reflect her awareness of that reality. But then, in her role as a fact-finder and judge of credibility, she examined the record as a whole and gave more weight to some of the evidence and less (or none) to other parts of the evidence.

I have long believed that there is profound wisdom in the attitude which Prince Hamlet adopted while appraising the life of his recently deceased father. Reflecting upon the totality of his father's life, Hamlet sums up his reflections by simply saying: "Take him for all in all." William Shakespeare, *Hamlet* act 1, sc. 2. As I read the trial justice's decision in the instant case, she acted in an analogous manner; she indicated that some of the evidence militated in favor of there being a common law marriage while some of the evidence militated in the contrary direction. Then, in the end, she decided that the former outweighed the latter to the point of constituting clear and convincing evidence of the existence of a common law marriage between Ms. Luis and Mr. Gaugler.

I approach the conclusion of this dissent by stating that, in light of her impressively meticulous and voluminous fact-finding and her conscientious effort to make determinations as to witness credibility, which were the product of what she observed from her "front-row seat,"[5] the trial justice pointed to evidence that more than satisfied the operative and quite demanding "clear and convincing" standard of proof—which standard required her "to have a clear conviction without hesitancy of the truth of the precise facts in issue." *In re Kurt H.*, 152 A.3d 408, 411 (R.I. 2017) (internal quotation marks omitted).

---

[5] *See, e.g.*, *In re Daniel D.*, 9 A.3d 651, 656 (R.I. 2010) ("We emphasize that the trial justice hears the testimony from the vantage point of his [or her] front-row seat in the courtroom. * * * For this reason, we defer to the trial justice's findings.") (internal quotation marks omitted); *State v. Woods*, 936 A.2d 195, 198 (R.I. 2007) ("We will not interfere with the hearing justice's conclusions with respect to the credibility of the complaining child-witness. We do not have the same vantage point as the presiding judge, and we are unable to assess the witness' demeanor, tone of voice, and body language. Our perspective is limited to analyzing words printed on a black and white record."); *State v. Texter*, 896 A.2d 40, 43-44 (R.I. 2006) ("The credibility of witnesses and the weight of the evidence is reserved to the fact-finder and is not the function of this Court."); *Perry v. Garey*, 799 A.2d 1018, 1022 (R.I. 2002) ("[A]s a front-row spectator the trial justice has the chance to observe the witnesses as they testify and is therefore in a better position to weigh the evidence and to pass upon the credibility of the witnesses than is this [C]ourt.") (internal quotation marks omitted).

I am unable and unwilling to assign error to the trial justice in this case. She presided over a lengthy trial, during the course of which there was evidence submitted that was supportive of a finding of common law marriage as well as evidence to the contrary. Then, in an impressive, carefully detailed written decision (a decision which spans over 100 pages and contains, *inter alia*, 142 highly specific findings of fact), the trial justice reviewed the evidence with care and concluded that, viewed in its totality, the evidence constituted clear and convincing evidence of the existence of a common law marriage between Ms. Luis and Mr. Gaugler.

It is my unblinking opinion that, giving appropriate deference to the trial justice's findings of fact and her credibility determinations, there very definitely was clear and convincing evidence of the existence of a common law marriage between Ms. Luis and Mr. Gaugler.[6] Therefore, I respectfully but vigorously dissent from the contrary conclusion reached by the majority.

---

[6] The subject of common law marriage has generated a good deal of legal scholarship in recent decades—with some writers lauding the doctrine and others viewing it as outmoded. *See, e.g.*, Sonya C. Garza, *Common Law Marriage: A Proposal for the Revival of a Dying Doctrine*, 40 New Eng. L. Rev. 541 (2006); Mary Ann Glendon, *Marriage and the State: The Withering Away of Marriage*, 62 Va. L. Rev. 663 (1976); Charlotte K. Goldberg, *The Schemes of Adventuresses: The Abolition and Revival of Common-Law Marriage*, 13 Wm. & Mary J. Women & L. 483 (2007); Ellen Kandoian, *Cohabitation, Common Law Marriage, and the Possibility of a Shared Moral Life*, 75 Geo. L.J. 1829 (1987); Sarah Primrose, *The Decline of Common Law Marriage & The Unrecognized Cultural Effect*, 34 Whittier L. Rev. 187 (2013). While either the General Assembly or this Court may, in an appropriate case at some future time, wish to examine the subject of common law marriage in a comprehensive manner, this dissent (like the majority opinion) is predicated on existing Rhode Island law.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Angela Luis v. Kevin Gaugler. |
| **Case Number** | No. 2016-334-Appeal.<br>( 13-1615) |
| **Date Opinion Filed** | June 11, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Patricia K. Asquith |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Richard A. Boren, Esq.<br>Jane F. Howlett, Esq. |
| | For Defendant:<br><br>Cristine L. McBurney, Esq. |